## NEW YORK STATE *v.* ROBERTS.

ERROR TO THE SUPREME COURT OF THE STATE OF NEW YORK.

No. 21. Argued April 20, 21, 1898. — Decided October 31, 1898.

The statutes of the State of New York, providing that "Every corporation, joint stock company or association whatever, now or hereafter incorporated, organized or formed under, by or pursuant to law in this State or in any other State or country and doing business in this State, except only saving banks and institutions for savings, life insurance companies, banks, foreign insurance companies, manufacturing or mining corporations or companies wholly engaged in carrying on manufacture or mining ores within this State, and agricultural and horticultural societies or associations, which exceptions, however, shall not include gas companies, trust companies, electric or steam heating, lighting and power companies, shall be liable to and shall pay a tax as a tax upon its franchise or business into the state treasury annually, to be computed as follows:" and that " The amount of capital stock which shall be the basis for tax . . . in the case of every corporation, joint stock company and association liable to taxation thereunder shall be the amount of capital stock

employed within this State," as construed by the highest court of that State, are not repugnant to the Constitution of the United States.

It must be regarded as finally settled by frequent decisions of this court, that, subject to certain limitations as respects interstate and foreign commerce, a State may impose such conditions upon permitting a foreign corporation to do business within its limits as it may judge expedient; and that it may make the grant or privilege dependent upon the payment of a specific license tax, or a sum proportioned to the amount of its capital used within the State.

PARKE, Davis & Company is the name of a corporation organized under the laws of the State of Michigan for the manufacture and sale of chemical and pharmaceutical preparations. The factory is situated in the city of Detroit. The corporation has a warehouse and depot in the city of New York, and there keeps on hand varying quantities of its manufactured products, which are there sold at wholesale in original packages. The concern is represented in New York by John Clay as manager, who is paid a salary. The business of selling the manufactured articles is carried on in all respects like the ordinary sales of consigned goods. Clay, in his own name, but for the use of the company, imports crude drugs from foreign countries at the port of New York. Such crude drugs are, in large part, sent to the Detroit factory for use, but some portions are sold in the original packages in the city of New York.

The corporation pays an annual rental for its place of business in New York of $12,500, employs there a force of over fifty persons, and expended for the New York branch annually, for the years 1890 to 1894, inclusive, from $102,000 to $172,000. The property owned in New York, in the way of business fixtures, is valued at $15,000; the average stock of goods sent from Michigan and carried in New York during those years was $50,000. It also employed in New York during that period a continuing capital, used in the purchase and sale of crude drugs, of from $23,000 to $62,000 per year.

Upon this state of facts the comptroller of New York imposed for 1894, and five previous years, an annual tax based upon the sum of $90,000 as "capital employed within the State."

At the time of the imposition of this tax the provisions of the statute here drawn in question were as follows (sec. 3, chap. 542, Laws of 1880, as amended by Laws of 1881, chap. 361; Laws of 1885, chap. 359; Laws of 1889, chaps. 193 and 353):

"Every corporation, joint stock company or association whatever, now or hereafter incorporated, organized or formed under, by or pursuant to law in this State, or in any other State or country and doing business in this State, except only savings banks and institutions for savings, life insurance companies, banks, foreign insurance companies, manufacturing or mining corporations or companies wholly engaged in carrying on manufacture or mining ores within this State, and agricultural and horticultural societies or associations, which exceptions, however, shall not include gas companies, trust companies, electric or steam heating, lighting and power companies, shall be liable to and shall pay a tax as a tax upon its franchise or business into the state treasury annually, to be computed as follows."

Then come provisions grading the tax according to annual dividends. The tax originally fell upon the entire capital of a corporation, but the statute was amended in 1885 so as to read:

"The amount of capital stock which shall be the basis for tax under the provisions of section three (*supra*) in the case of every corporation, joint stock company and association liable to taxation thereunder, shall be the amount of capital stock employed within this State."

Parke, Davis & Company, through their said manager, filed a petition in the New York Supreme Court, praying for a writ of certiorari directed to the comptroller, in order to subject his assessment to correction. In the petition it was alleged that the only capital in any proper sense employed by the company within the State of New York in the sale of its products was its leasehold of the warehouse and the office furniture and fixtures, not exceeding in value $15,000; that said company, being a manufacturing corporation, was exempt from taxation under the laws of the State of New York; that the comptroller erred in deciding that goods manufactured

by said corporation and stored at its depot in New York are capital employed in said State within the meaning of the statute.; that if said statute was correctly interpreted by the comptroller, then said statute was unconstitutional and void as in contravention of the Constitution of the United States and the amendments thereof.

To the certiorari granted upon said petition the comptroller duly made a return, alleging that his acts and proceedings were valid.

The cause was heard at the December term, 1895, of said court, and judgment was entered quashing the writ of certiorari, and confirming the comptroller's assessment. From that judgment an appeal was taken to the Court of Appeals of the State of New York, and on June 9, 1896, the cause was heard, the order and judgment of the Supreme Court were affirmed, and the record remitted to the Supreme Court. 91 Hun, 158; 149 N. Y. 608.

Whereupon the cause was brought to this court by a writ of error duly prayed for and allowed.

*Mr. James McKeen* for plaintiff in error.

*Mr. T. E. Hancock,* attorney general of the State of New York for defendant in error. *Mr. William Henry Dennis* was on his brief.

MR. JUSTICE SHIRAS, after stating the case, delivered the opinion of the court.

The construction put upon the statute of the State of New York by its courts is, of course, binding upon this court, and that portion of the contention which questioned the action of the comptroller on the ground of a misinterpretation of the law is thus disposed of.

It must be regarded as finally settled by frequent decisions of this court that, subject to certain limitations as respects interstate and foreign commerce, a State may impose such conditions upon permitting a foreign corporation to do business

within its limits as it may judge expedient; and that it may make the grant or privilege dependent upon the payment of a specific license tax, or a sum proportioned to the amount of its capital used within the State. *Paul* v. *Virginia*, 8 Wall. 168; *Horn Silver Mining Co.* v. *New York*, 143 U. S. 305.

Accordingly the counsel for the plaintiff in error disavows in his brief any wish to bring those decisions into further review, but his contention is that this Michigan corporation, having come within the jurisdiction of New York by compliance with all the provisions of law imposing conditions for transacting business within the State, is denied the equal protection of the law when subjected to a tax from which are exempted other corporations, foreign and domestic, which wholly manufacture the same class of goods within the State; that such a tax is an unjust discrimination against this corporation, whose place of manufacture is in the State of Michigan. By this contention it is not meant, of course, that this particular corporation is, in terms, discriminated against in the New York statute, but that all corporations which manufacture their goods wholly in other States and send them for sale in New York are discriminated against in favor of such corporations, whether foreign or domestic, as manufacture their goods within the State of New York.

To sustain this contention the well-known line of cases is cited, wherein this court has had to deal with state legislation imposing discriminating taxes against the products of other States. *Walling* v. *Michigan*, 116 U. S. 446; *Robbins* v. *Shelby. County Taxing District* 120 U. S. 489; *Minnesota* v. *Barber,* 136 U. S. 313.

If the object of the law in question was to impose a tax upon products of other States, while exempting similar domestic goods from taxation, there might be room to contend that such a distinction was constitutionally objectionable as tending to affect or regulate commerce between the States. But we think that obviously such is not the purpose of this legislation. "Every corporation, joint stock company or association whatever, now or hereafter incorporated, organized or formed under, by or pursuant to law in this State or in any

other State or country and doing business in this State, . . . shall be liable to and shall pay a tax as a tax upon its franchise or business into the state treasury annually, to be computed as follows." ·

It will be perceived that the tax is prescribed as well for New York corporations as for those of other States. It is true that manufacturing or mining corporations wholly engaged in carrying on manufacture or mining ores within the State of New York are exempted from this tax; but such exemption is not restricted to New York corporations, but includes corporations of other States as well, when wholly engaged in manufacturing within the State.

In construing this statute it was held, in the case of *People ex rel. Blackinton Co.* v. *Roberts*, 4 Appellate Div. 388, that a New York corporation which carried on a manufacturing business in another State was liable to this tax; and this decision was affirmed by the New York Court of Appeals. 151 N. Y. 652.

The tax is graded according to annual dividends, and originally was assessed upon the entire capital of a corporation; but the statute was amended in 1885 so as to read: "The amount of capital stock which shall be the basis for tax under the provisions of section three, in the case of every corporation, joint stock company and association liable to taxation thereunder, shall be the amount of capital stock employed within this State."

So that it is apparent that there is no purpose disclosed in the statute either to distinguish between New York corporations and those of other States to the detriment of the latter, or to subject property out of the State to taxation.

In the present case, indeed, complaint is made of the action of the comptroller in determining the "amount of the capital stock employed within the State"—that the amount fixed by him was too large. The action of the comptroller was subject to revision, and the corporation's complaints in respect thereto were heard and passed upon by the Supreme Court of New York. The estimate of the comptroller, in determining the amount of capital employed in the State, would not be judi-

cially interfered with unless it was clearly shown that the same was erroneous; and, even then, such errors would not present a Federal question for our consideration.

Nor can we consider the further contention that portions of the business which were made the basis of the assessment were improperly treated as business of the corporation, whereas they should have been regarded as pertaining to the personal transactions of Mr. Clay, the company's agent. The true relation of Mr. Clay to the corporation's business was one of fact, in respect to which a hearing was afforded to the corporation, and this court is in no position to enter into such an inquiry.

Again, it is said that, even assuming that the importation of crude drugs and their sale in the original packages constituted a portion of the corporate business, no tax could be imposed by the State under the doctrine of *Brown* v. *Maryland*, 12 Wheat. 419.

But that case is inapplicable. Here no tax is sought to be imposed directly on imported articles or on their sale. This is a tax imposed on the business of a corporation, consisting in the storage and distribution of various kinds of goods, some products of their own manufacture and some imported articles. From the very nature of the tax, being laid as a tax upon the franchise of doing business as a corporation, it cannot be affected in any way by the character of the property in which its capital stock is invested. *Society for Savings* v. *Coite*, 6 Wall. 594; *Provident Institution* v. *Massachusetts*, 6 Wall. 611; *Pembina Mining Co.* v. *Pennsylvania*, 125 U. S. 181; *Home Insurance Co.* v. *New York*, 134 U. S. 594.

When a corporation of one State, whose business is that of a common carrier, transacts part of that business in other States, difficult questions have arisen, and this court has been called upon to decide whether certain taxing laws of the respective States infringe upon the freedom of interstate commerce. It has been found difficult to prescribe a satisfactory rule whereby the public burdens of taxation can be justly apportioned between the business and agencies of such a corporation in different States, and the subject has been much

discussed in several recent cases. *Western Union Telegraph Co.* v. *Massachusetts*, 125 U. S. 530; *Pittsburgh, Cincinnati, &c. Railway* v. *Backus*, 154 U. S. 421; *Pullman's Palace Car Co.* v. *Pennsylvania*, 141 U. S. 18; *Adams Express Co.* v. *Ohio*, 165 U. S. ¬94. It is not necesᵃry in this case to enter into a subject so difficult, but the cases are referred to as showing the distinction between corporations organized to carry on interstate commerce, and having a quasi-public character, and corporations organized to conduct strictly private business.

The corporation concerned in the present litigation is of the latter character, and the case comes within the doctrine of *Paul* v. *Virginia*, 8 Wall. 168, and of subsequent cases affirming that one. *Horn Silver Mining Co.* v. *New York*, 143 U. S. 305, may be specially mentioned, as it involved a similar question and the same statutes which are before us in the present case. The Horn Silver Mining Company was a corporation of the Territory of Utah, where it carried on a mining and manufacturing business. It also carried on business in the State of New York, and was there subjected to an annual tax upon its corporate franchise or business, as prescribed in the statute of the State of New York. The company refusing to pay the tax, proceedings to enforce its payment were resorted to, which resulted in the case being brought to this court, where some of the questions raised in the present case were considered and determined. The conclusions reached were that the law in question did not tax property not within the State; nor regulate interstate commerce; nor deny to the corporation the equal protection of the laws; nor impose a tax beyond the constitutional power of the State.

It is said that the operation of that portion of this taxing law which exempts from a business tax corporations which are wholly engaged in manufacturing within the State of New York, is to encourage manufacturing corporations which seek to do business in that State to bring their plants into New York. Such may be the tendency of the legislation, but so long as the privilege is not restricted to New York corpora-

tions, it is not perceived that thereby any ground is afforded to justify the intervention of the Federal courts.

The judgment of the Supreme Court of the State of New York is accordingly

*Affirmed.*

MR. JUSTICE HARLAN, with whom concurred MR. JUSTICE BROWN, dissenting.

It seems to me that the opinion and judgment in this case are not in harmony with former decisions of this court.

The comptroller of New York has imposed upon the plaintiff in error, a Michigan corporation doing business in New York, an annual tax for the year 1894 and the preceding five years, upon the sum of $90,000 "as capital employed" in the latter State. The authority for this tax was found in a statute of New York providing that "every corporation, joint stock company, or association whatever, now or hereafter incorporated, organized or formed under, by or pursuant to law in this State or in any other State or country, and doing business in this State, except only savings banks and institutions for savings, life insurance companies, banks, foreign insurance companies, manufacturing or mining corporations or companies wholly engaged in carrying on manufactures or mining ores within this State, and agricultural and horticultural societies or associations, which exceptions, however, shall not include gas companies, trust companies, electric or steam heating, lighting and power companies, shall be liable to and shall pay a tax, as a tax upon its franchise or business, into the state treasury annually, to be computed as follows," etc. Laws of N. Y., 1889, June 4, c. 353, p. 467.

The goods sold by the plaintiff in error, by its agents in New York, are manufactured in the State of Michigan. If the plaintiff had been wholly engaged in carrying on manufacture in New York it would have been exempted by the statute from the taxes in question.

So that the question in this case is, whether it is competent for New York to impose a tax upon the franchise or business

of manufacturing corporations or companies, foreign or domestic, not "wholly engaged" in carrying on manufacture within its limits, while at the same time it exempts from such taxation like corporations or companies wholly engaged in carrying on manufactures in that State.

Is not such legislation an injurious discrimination against the manufacturing business and the manufactured goods of other States, in favor of the manufacturing business and the manufactured goods of New York, which is forbidden by the Constitution of the United States? Let us see. The question presented for consideration is of such importance as to justify an extended reference to our former decisions.

In *Woodruff* v. *Parham*, 8 Wall. 123, 140, it was contended that a provision in the charter of the city of Mobile, Alabama, authorizing the collection of a tax on sales at auction, was invalid in its application to auctioneers who sold in that State in the original packages goods and merchandise the product of States other than Alabama. This court said: "The case before us is a simple tax on sales of merchandise, imposed alike upon all sales made in Mobile, whether the sales be made by a citizen of Alabama or of another State, and whether the goods sold are the produce of that State or of some other. There is no attempt to discriminate injuriously against the products of other States or the rights of their citizens, and the case is not therefore an attempt to fetter commerce among the States, or to deprive the citizens of other States of any privilege or immunity possessed by citizens of Alabama. But a law having such operation would, in our opinion, be an infringement of the provisions of the Constitution which relate to those subjects, and therefore void."

At the same term of the court *Hinson* v. *Lott*, 8 Wall. 148, 150, 151, 152, was decided. That case involved the validity of a statute of Alabama declaring that "before it shall be lawful for any dealer or dealers in spirituous liquors to offer any such liquors for sale within the limits of this State, such dealer or dealers introducing any such liquors into the State for sale shall first pay the tax collector of the county into which such liquors are introduced, a tax of fifty cents per

gallon upon each and every gallon thereof." This court said: "If this section [the one just quoted] stood alone in the legislation of Alabama on the subject of taxing liquors, the effect of it would be that all such liquors brought into the State from other States and offered for sale, whether in the original casks by which they came into the State, or by retail in smaller quantities, would be subject to a heavy tax, while the same class of liquors manufactured in the State would escape the tax. It is obvious that the right to impose any such discriminating tax, if it exist at all, cannot be limited in amount, and that a tax under the same authority can as readily be laid which would amount to an absolute prohibition to sell liquors introduced from without, while the privilege would remain unobstructed in regard to articles made in the State. If this can be done in reference to liquors, it can be done with reference to all the products of a sister State, and *in this mode one State can establish a complete system of non-intercourse in her commercial relations with all the other States of the Union.*" Again: "But while the case has been argued here with a principal reference to the supposed prohibition against taxing imports, it is to be seen from the opinion of the Supreme Court of Alabama delivered in this case, that the clause of the Constitution which gives to Congress the right to regulate commerce among the States was supposed to present a serious objection to the validity of the Alabama statute. Nor can it be doubted that a tax which so seriously affects the interchange of commodities between the States as to essentially impede or seriously interfere with it, is a regulation of commerce. And it is also true, as conceded in that opinion, that Congress has the same right to regulate commerce among the States that it has to regulate commerce with foreign nations, and that whenever it exercises that power all conflicting state laws must give way, and that if Congress had made any regulation covering the matter in question we need inquire no further. That court seems to have relieved itself of the objection by holding that the tax imposed by the State of Alabama was an exercise of the concurrent right of regulating commerce remaining with the State until some regulation on the subject had been made

by Congress. But, assuming the tax to be, as we have supposed, a discriminating tax, levied exclusively upon the products of sister States, and looking to the consequences which the exercise of this power may produce if it be once conceded, amounting, as we have seen, to a total abolition of all commercial intercourse between the States, under the cloak of the taxing power, we are not prepared to admit that a State can exercise such a power, though Congress may have failed to act on the subject in any manner whatever." Referring to the doctrine announced in *Cooley* v. *Philadelphia Port Wardens*, 12 How. 299, that there is a class of legislation of a general nature affecting the commercial interests of all the States, which, from its essential character, is national; and which must, so far as it affects these interests, belong exclusively to the Federal Government, the court said: "'The tax in the case before us, if it were of the character we have suggested, discriminating adversely to the products of all the other States, in favor of those of Alabama, and involving a principle which might lead to actual commercial non-intercourse, would, in our opinion, belong to that class of legislation, and be forbidden by the clause of the Constitution just mentioned." Upon examining the entire revenue statute of Alabama it was found that it did not injuriously discriminate against the products of other States, and the court said: "As the effect of the act is such as we have described, and it institutes no legislation which discriminates against the people of sister States, but merely subjects them to the same rate of taxation which similar articles pay that are manufactured within the State, we do not see in it an attempt to regulate commerce, but an appropriate and legitimate exercise of the taxing power of the States."

In *Ward* v. *Maryland*, 12 Wall. 418, 429, the court held to be unconstitutional a statute of Maryland, making it a penal offence for any person, "not being a permanent resident" of that State, to sell, offer or expose for sale, within the city of Baltimore, any goods, wares or merchandise whatever, other than agricultural products and articles manufactured in the State of Maryland, without first obtaining a license so to do

—such license being fixed at $300 per year, while the license fees or taxes required of resident traders were from $15 to $150. The statute was adjudged to be void, because it discriminated against the people and products of other States. After referring to some of the former decisions, this court said: "Taxes, it is conceded in those cases, may be imposed by a State on all sales made within the State, whether the goods sold were the produce of the State imposing the tax, or of some other State, provided the tax imposed is uniform; but the court at the same time decides in both cases that a tax discriminating against the commodities of the citizens of the other States of the Union would be inconsistent with the provisions of the Federal Constitution, and that the law imposing such a tax would be unconstitutional and invalid. Such an exaction, called by what name it may be, is a tax upon the goods or commodities sold, as the seller must add to the price to compensate for the sum charged for the license, which must be paid by the consumer or by the seller himself; and in either event the amount charged is equivalent to a direct tax upon the goods or commodities. Imposed as the exaction is upon persons not permanent residents in the State, it is not possible to deny that the tax is discriminating with any hope that the proposition could be sustained by the court."

In *Welton* v. *Missouri*, 91 U. S. 275, 279, 281, the question was as to the validity of a statute of Missouri declaring that whoever should deal in the selling of patent and other medicines, goods, wares and merchandise, except books, charts, maps and stationery, which were "not the growth, produce or manufacture of this State," by going from place to place to sell the same, should be deemed a pedler, and prohibiting him, under a penalty, from dealing as such without first obtaining a license, no license being required for selling, "by going from place to place," the produce or manufacture of the State. The constitutionality of that statute was sought to be maintained upon the ground that it was only a tax upon a calling. The state court took that view of the statute, and observed that it was a calling limited to

the sale of merchandise not the growth or product of Missouri. But this court, after referring to *Brown* v. *Maryland*, 12 Wheat. 419, 444, as holding an act of Maryland to be in conflict with the Constitution of the United States because it imposed a license tax upon the importer of foreign goods, said: "So, in like manner, the license tax exacted by the State of Missouri from dealers in goods which are not the product or manufacture of the State, before they can be sold from place to place within the State, must be regarded *as a tax upon such goods themselves;* and the question presented is, whether legislation thus discriminating against the products of other States in the conditions of their sale by a certain class of dealers is valid under the Constitution of the United States." The question thus presented was solved by the judgment of this court declaring the legislation of Missouri to be unconstitutional. It was further said: "If Missouri can require a license tax for the sale by travelling dealers of goods which are the growth, product or manufacture of other States or countries, it may require such license tax as a condition of their sale from ordinary merchants, and the amount of the tax will be a matter resting exclusively in its discretion. The power of the State to exact a license tax of any amount being admitted, no authority would remain in the United States or in this court to control its action, however unreasonable or oppressive. Imposts operating as an absolute exclusion of the goods would be possible, and all the evils of discriminating state legislation, favorable to the interests of one State and injurious to the interests of other States and countries, which existed previous to the adoption of the Constitution, might follow, and the experience of the last fifteen years shows would follow, from the action of some of the States."

The case of *Guy* v. *Baltimore*, 100 U. S. 434, 439, 443, is much in point. That case involved the validity of certain ordinances of the mayor and council of Baltimore based upon an act of the General Assembly of Maryland authorizing the mayor and city council of Baltimore to regulate, establish, charge and collect, to the use of the said mayor and city council, such rate of wharfage as they deemed reasonable, "of and from all

vessels resorting to or lying at, landing, depositing or transporting goods or articles *other than the productions of this State,* on any wharf or wharves belonging to said mayor and city council, or any public wharf in the said city, other than the wharves belonging to or rented by the State."

This court, after referring to the previous cases of *Woodruff* v. *Parham, Hinson* v. *Lott* and *Ward* v. *Maryland,* said: "In view of these and other decisions of this court, it must be regarded as settled that no State can, consistently with the Federal Constitution, impose upon the products of other States, brought therein for sale or use, or upon citizens because engaged in the sale therein, or the transportation thereto, of the products of other States, more onerous public burdens or taxes than it imposes upon the like products of its own territory. If this were not so, it is easy to perceive how the power of Congress to regulate commerce with foreign nations and among the several States could be practically annulled, and the equality of commercial privileges secured by the Federal Constitution to citizens of the several States be materially abridged and impaired."

In the argument of that case it was contended that the city, by virtue of its ownership of the wharves in question, had the right, in its discretion, to permit their free use to all vessels landing at them with the products of Maryland ; and that those operating vessels laden with the products of other States, cannot justly complain, so long as they are not required to pay wharfage fees in excess of reasonable compensation for the use of the city's property. The court said: "This proposition, however ingenious or plausible, is unsound both upon principle and authority. The municipal corporation of Baltimore was created by the State of Maryland to promote the public interests and the public convenience. The wharf at which appellant landed his vessel was long ago dedicated to public use. The public for whose benefit it was acquired, or who are entitled to participate in its use, are not alone those who may engage in the transportation to the port of Baltimore of the products of Maryland. It embraces, necessarily, all engaged in trade and commerce upon the public navigable

waters of the United States. Every vessel employed in such trade and commerce may traverse those waters without let or hindrance from local or state authority; and the national Constitution secures to all so employed, without reference to the residence or citizenship of the owners, the privilege of landing at the port of Baltimore with any cargo whatever, not excluded therefrom by or under the authority of some statute in Maryland enacted in the exertion of its police powers. The State, it will be admitted, could not lawfully impose upon such cargo any direct public burden or tax because it may consist, in whole or in part, of the products of other States. The concession of such a power to the States would render wholly nugatory all national control of commerce among the States, and place the trade and business of the country at the mercy of local regulations, having for their object to secure exclusive benefits to the citizens and products of particular States. But it is claimed that a State may empower one of its political agencies, a mere municipal corporation representing a portion of its civil power, to burden interstate commerce by exacting from those transporting to its wharves the products of other States wharfage fees which it does not exact from those bringing to the same wharves the products of Maryland. The city can no more do this than it or the State could discriminate against the citizens and products of other States in the use of the public streets or other public highways. . . . Municipal corporations owning wharves upon the public navigable waters of the United States, and quasi-public corporations transporting the products of the country, cannot be permitted by discriminations of that character to impede commercial intercourse and traffic among the several States and with foreign nations. In the exercise of its police powers a State may exclude from its territory or prohibit the sale therein of any articles which, in its judgment, fairly exercised, are prejudicial to the health or would endanger the lives or property of its people. But if the State, under the guise of exerting its police powers, should make such exclusion or prohibition applicable solely to articles of that kind that may be produced or manufactured in other

States, the courts would find no difficulty in holding such legislation to be in conflict with the Constitution of the United States."

In *Machine Co.* v. *Gage*, 100 U. S. 676, 679, a statute of Tennessee imposing a license tax upon all pedlers of sewing machines was sustained, as not in violation of the Federal Constitution, because it applied "alike to sewing machines manufactured in the State and out of it." This court said: "In all cases of this class to which the one before us belongs, it is a test question whether there is any discrimination in favor of the State or of the citizens of the State which enacted the law. Wherever there is such discrimination it is fatal. Other considerations may lead to the same result. In the case before us, the statute in question, as construed by the Supreme Court of the State, makes no such discrimination. It applies alike to sewing machines manufactured in the State and out of it. The exaction is not an unusual or unreasonable one. The State, putting all such machines upon the same footing with respect to the tax complained of, had an unquestionable right to impose the burden. *Woodruff* v. *Parham, Hinson* v. *Lott, Ward* v. *Maryland, Welton* v. *Missouri, supra.*"

*Webber* v. *Virginia*, 103 U. S. 344, 350, is also very much in point. That case involved the validity of a statute of Virginia providing that "any person who shall sell, or offer for sale, the manufactured articles or machines of other States or Territories, unless he be the owner thereof and taxed as a merchant, or take orders therefor, on commission or otherwise, shall be deemed to be an agent for the sale of manufactured articles of other States and Territories, and should not act as such without taking out a license therefor. No such person shall, under his license as such, sell or offer to sell such articles through the agency of another; but a separate license shall be required from an agent or employé who may sell or offer to sell such articles for another. For any violation of this section, the person offending shall pay a fine of not less than fifty dollars nor more than one hundred dollars for each offence. The specific license tax upon an agent for the sale of any manufactured article or machine of other States or

Territories shall be twenty-five dollars; and this tax shall give to any party licensed under this section the right to sell the same within the county or corporation in which he shall take out his license; and if he shall sell or offer to sell the same in any other of the counties or corporations of this State, he shall pay an additional tax of ten dollars in each of the counties or corporations where he may sell or offer to sell the same. All persons *other than resident manufacturers or their agents, selling articles manufactured in this State,* shall pay the specific license tax imposed by this section." §§ 45, 46.

This court said: "By these sections, read together, we have this result: the agent for the sale of articles manufactured in other States must first obtain a license to sell, for which he is required to pay a specific tax for each county in which he sells or offers to sell them; while the agent for the sale of articles manufactured in the State, if acting for the manufacturer, is not required to obtain a license or pay any license tax. Here there is a clear discrimination in favor of home manufacturers and against the manufacturers of other States. Sales by manufacturers are chiefly effected through agents. A tax upon their agents when thus engaged is, therefore, a tax upon them, and if this is made to depend upon the foreign character of the articles, that is, upon their having been manufactured without the State, it is to that extent a regulation of commerce in the articles between the States. It matters not whether the tax be laid directly upon the articles sold or in the form of licenses for their sale. If by reason of their foreign character the State can impose a tax upon them or upon the person through whom the sales are effected, the amount of the tax will be a matter resting in her discretion. She may place the tax at so high a figure as to exclude the introduction of the foreign article and prevent competition with the home product. It was against legislation of this discriminating kind that the framers of the Constitution intended to guard when they vested in Congress the power to regulate commerce among the several States."

In *Walling* v. *Michigan*, 116 U. S. 446, 459, 461, the principal

question was as to the validity of certain legislation in Michigan which, it was contended, discriminated against the manufactured products of other States. This court held the Michigan statute to be invalid, saying: "It is suggested by the learned judge who delivered the opinion of the Supreme Court of Michigan in this case, that the tax imposed by the act of 1875 is an exercise by the legislature of Michigan of the police power of the State for the discouragement of the use of intoxicating liquors, and the preservation of the health and morals of the people. This would be a perfect justification of the act, if it did not discriminate against the citizens and products of other States in a matter of commerce between the States, and thus usurp one of the prerogatives of the national legislature. The police power cannot be set up to control the inhibitions of the Federal Constitution, or the powers of the United States Government created thereby. *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650. . . . Another argument used by the Supreme Court of Michigan in favor of the validity of the tax is, that it is merely a tax on an occupation, which, it is averred, the State has an undoubted right to impose, and reference is made to *Brown* v. *Maryland*, 12 Wheat. 419, 444; *Nathan* v. *Louisiana*, 8 How. 73, 80; *Pierce* v. *New Hampshire*, 5 How. 593; *Hinson* v. *Lott*, 8 Wall. 148; *Machine Co.* v. *Gage*, 100 U. S. 676. *None of these cases, however, sustain the doctrine that an occupation can be taxed if the tax is so specialized as to operate as a discriminative burden against the introduction and sale of the products of another State, or against the citizens of another State.*"

In *Brimmer* v. *Rebman*, 138 U. S. 78, 81, 83, the question was as to the validity of a statute relating to the sale of meats in Virginia. This court said: "The recital in the preamble that unwholesome meats were being offered for sale in Virginia cannot exclude the question of the conformity of the act to the Constitution. . . . Is the statute now before us liable to the objection that, by its necessary operation, it interferes with the enjoyment of rights granted or secured by the Constitution? This question admits of but one answer. The statute is, in effect, a prohibition upon the sale in Virginia

of beef, veal or mutton, although entirely wholesome, if from animals slaughtered one hundred miles or over from the place of sale. We say prohibition, because the owner of such meats cannot sell them in Virginia until they are inspected there; and being required to pay the heavy charge of one cent per pound to the inspector, as his compensation, he cannot compete, upon equal terms, in the markets of that Commonwealth, with those in the same business whose meats, of like kind, from animals slaughtered within less than one hundred miles from the place of sale, are not subjected to inspection at all. Whether there shall be inspection or not, and whether the seller shall compensate the inspector or not, *is thus made to depend entirely upon the place where the animals from which the beef, veal or mutton is taken, were slaughtered.* Undoubtedly, a State may establish regulations for the protection of its people against the sale of unwholesome meats, provided such regulations do not conflict with the powers conferred by the Constitution upon Congress, or infringe rights granted or secured by that instrument. But it may not, under the guise of exerting its police powers, or of enacting inspection laws, *make discriminations against the products and industries of some of the States in favor of the products and industries of its own or other States.* The owner of the meats here in question, although they were from animals slaughtered in Illinois, had the right, under the Constitution, to compete in the markets of Virginia upon terms of equality with the owners of like meats, from animals slaughtered in Virginia or elsewhere within one hundred miles from the place of sale. Any local regulation which, in terms or by its necessary operation, denies this equality in the markets of a State is, when applied to the people and products or industries of other States, a direct burden upon commerce among the States, and, therefore, void. *Welton* v. *Missouri*, 91 U. S. 275, 281; *Railroad Co.* v. *Husen*, 95 U. S. 465; *Minnesota* v. *Barber*, above cited. The fees exacted, under the Virginia statute, for the inspection of beef, veal and mutton, the product of animals slaughtered one hundred miles or more from the place of sale, are, in reality, a tax; and, 'a discriminating tax imposed by a

State, operating to the disadvantage of the product of other States when introduced into the first-mentioned State, is, in effect, a regulation in restraint of commerce among the States, and, as such, is a usurpation of the powers conferred by the Constitution upon the Congress of the United States.' *Walling* v. *Michigan,* 116 U. S. 446, 455. Nor can this statute be brought into harmony with the Constitution by the circumstance that it purports to apply alike to the citizens of all the States, including Virginia; for, 'a burden imposed by a State upon interstate commerce is not to be sustained simply because the statute imposing it applies alike to the people of all the States, including the people of the State enacting such statute.' *Minnesota* v. *Barber*, above cited; *Robbins* v. *Shelby Taxing District*, 120 U. S. 487, 489. If the object of Virginia had been to obstruct the bringing into that State, for use as human food, of all beef, veal and mutton, however wholesome, from animals slaughtered in distant States, that object will be accomplished if the statute before us be enforced."

In *Emert* v. *Missouri*, 156 U. S. 296, 311, a Missouri statute, requiring the payment of a license tax by pedlers, was held to apply to the sale by pedlers in Missouri of sewing machines made in other States, and not to be a regulation of interstate commerce. The decision was placed upon the ground that the statute made no discrimination against the goods of other States as compared with domestic goods.

I am unable to reconcile the opinion and judgment in the present case with the principles announced in the above cases. A tax upon the capital employed by a manufacturing corporation or company is *pro tanto* a tax upon the goods manufactured by it. If this be not so, there are many expressions in the former opinions of this court which should be withdrawn or modified. A corporation or company wholly engaged in manufacture in New York has an advantage, in the sale of its goods in the markets of that State, over a corporation or company manufacturing like goods in other States, if the former is altogether exempted from taxation in respect of its franchise or business, and the latter subjected to taxation of its

franchise or business measured by the amount of its capital employed in New York. That State may undoubtedly tax capital employed within its limits by corporations or companies of other States, but it cannot impose restrictions that will necessarily prevent such corporations or companies from selling their goods in New York upon terms of equality with corporations or companies wholly engaged there in manufacturing goods of like kind. By this statute New York says to the manufacturing corporations and companies of other States: " Remove your plant to New York, and the capital employed by you in this State shall be exempt from taxation. But if you persist in keeping your plant where it is already established, your franchise or business shall be taxed upon the basis of the capital employed by you in New York, while the capital of similar corporations or companies wholly engaged in manufacturing in New York, shall be exempt from taxation." Observe, that the statute of New York does not apply exclusively to corporations. It applies equally to companies.

In my judgment, this statute cannot be sustained in its application to the plaintiff in error without recognizing the power of New York, so far as the Federal Constitution is concerned, to enact such statutes as will, by their necessary operation, amount to a tariff protecting goods manufactured in that State against competition in the markets there with goods manufactured in other States. And if such legislation as is embodied in the statute in question is held to be consistent with the Federal Constitution, why may not New York, while exempting from taxation the franchise or business of corporations or companies wholly engaged in carrying on their manufacturing in that State, put such taxation upon the franchise or business of corporations or companies doing business in that State, but not wholly engaged in manufacture there, as will amount to an absolute prohibition upon the sale in New York of the goods manufactured in other States? If each State in the Union should enact a statute exempting from taxation the franchise and business of corporations or companies wholly engaged in carrying on manufacture within its limits, but taxing the franchise or business of corporations or companies

whose manufacturing is carried on in other States, it is easy
to see that commerce among the States would be as much at
the mercy of discriminating state legislation as it was under
the Articles of Confederation, when, as Mr. Justice Story well
said, the Government established to conserve the interests of
the people of all the States was competent to declare every-
thing, but was without power to do anything. While the
authority of the National Government to lay duties upon
goods brought from foreign countries into this country so as
to build up and protect American industries has been recog-
nized, I had not supposed it was competent for any State of
the Union to exert its power of taxation so as to build up and
protect its local industries by means of injurious discrimina-
tions against the industries of other States. I had supposed
that the Constitution of the United States had established
absolute free trade among the States of the Union, and that
freedom from injurious discrimination in the markets of any
State, against goods manufactured in this country, was a vital
principle of constitutional law.

The opinion of the court in this case says: "If the *object* of
the law in question was to impose a tax upon products of other
States, while exempting similar domestic goods from taxation,
there might be room to contend that such a distinction was
constitutionally objectionable as tending to affect or regulate
commerce between the States. But we think that obviously
such is not the *purpose* of this legislation. 'Every corpora-
tion, joint stock company or association whatever, now or
hereafter incorporated, organized or formed under, by or pur-
suant to law in this State or in any other State or country and
doing business in this State, . . . shall be liable to and shall
pay a tax as a tax upon its franchise or business into the state
treasury annually, to be computed as follows.' It will be per-
ceived that the tax is prescribed as well for New York cor-
porations as for those of other States. It is true that manu-
facturing or mining corporations wholly engaged in carrying
on manufacture or mining ores within the State of New York
are exempted from this tax; but such exemption is not re-
stricted to New York corporations, but includes corporations

of other States as well, when wholly engaged in manufacture within the State."

I submit that the validity of state legislation, as affected by the Constitution of the United States, is not to be determined altogether by what is supposed to be the "object" or "purpose" of such legislation, if by object or purpose is meant the motive which controlled members of the state legislature when they enacted such legislation. In a legal sense the object or purpose of legislation is to be determined by its natural and reasonable effect, whatever may have been the motives upon which legislators acted. *Henderson* v. *Mayor of New York*, 92 U. S. 259. This has often been adjudged by this court. "There may be no purpose," this court has said, "upon the part of a legislature to violate the provisions of that instrument, and yet a statute enacted by it, under the forms of law, may, by its necessary operation, be destructive of rights granted or secured by the Constitution;" in which case, "the courts must sustain the supreme law of the land by declaring the statute unconstitutional and void." *Minnesota* v. *Barber*, 136 U. S. 313, 319, and authorities there cited. Can it be doubted that, whatever may have been the ostensible object for which the New York statute was passed, the natural and reasonable effect of the statute is to withhold from goods not manufactured in New York — *and because they were not there manufactured* — that equality in the markets of New York which, we have often said, is secured by the National Constitution to the like products of other States? If the plaintiff corporation can be taxed on its capital employed in New York in the business of selling its goods, manufactured in Michigan, while capital employed in New York by a like manufacturing corporation is exempted from taxation *because, and only because, it is wholly engaged in manufacture in that State,* is it possible to deny that such legislation injuriously discriminates against the manufactures of Michigan in favor of the like manufactures of New York?

My brethren refer to the general rule that it is competent for a State to prescribe the conditions upon which corporations of other States may do business within its limits. But I sub-

mit that that rule, however broadly stated, has no application here. The New York statute has not assumed to prescribe any rule applicable alike to all manufacturing corporations or companies of other States. It exempts from taxation all corporations or companies, whether of New York or of other States, that wholly carry on their manufacturing business in New York. Thus a distinction is made between manufacturing corporations and companies by exempting from taxation on their capital employed in New York those, and those only, that wholly carry on their manufacturing in that State. Besides, this court has never, in any case, adjudged that the power of a State to prescribe the conditions upon which the corporations of other States may do business within its limits can be exerted by legislation that directly, or by its necessary operation, discriminates injuriously against the products of other States in favor of the products of such State. On the contrary, in the cases above cited, it has directly adjudged that such legislation was unconstitutional. It is not necessary for me now to question the soundness of the general proposition that a State may prescribe the conditions upon which corporations of other States may come within its limits for purposes of business. A good deal may depend upon the nature of the business in which the foreign corporation is engaged. But I do question the power of any State to exact a tax from corporations or companies not wholly engaged in manufacturing within its limits, if it exempts from such taxation corporations and companies wholly engaged, and only because they are wholly engaged, in manufacturing in such State. If this be not a sound view of the Constitution, it follows that local tax laws may be so framed as to destroy the principle, frequently announced and often recognized by this court, that the products of the respective States may go into the markets of the country without being discriminated against because of the place of their origin.

The only case which seems to give any support whatever to the opposite view is *Horn Silver Mining Co.* v. *New York,* 143 U. S. 305. But a careful examination of the report of that case and of the opinion shows that counsel did not present, nor did

the court consider or determine, the precise point here presented, as to the authority of the State to exercise the power of taxation so as to place burdens upon goods, the manufacture of other States, solely because they were not produced in the State imposing the taxation.

Some stress seems to be laid upon the fact that the exemption given by the statute to corporations or companies wholly engaged in carrying on manufactures or in mining ores within the State of New York is not limited to corporations or companies of that State; but that the exemption is allowed to such corporations or companies of other States as may carry on their manufacturing or mining business wholly in New York. This view falls far short of meeting the difficulty presented, namely, that the statute, by its necessary operation, injuriously discriminates against goods manufactured in other States, in that such goods are not permitted to go into the markets of New York and compete there upon equal terms with like goods wholly manufactured in that State. This court has often said that the objection that a local statute was invalid, as restraining or binding commerce among the States, was not met by the suggestion that it operated equally upon citizens of the State which enacted it.

I am of opinion that the statute of New York in its application to the plaintiff in error is inconsistent with the power of Congress to regulate commerce among the States, and with that clause of the Fourteenth Amendment, which prohibits any State from denying to any person within its jurisdiction the equal protection of the laws. It is well settled that corporations are persons within the meaning of that clause of the Constitution. *Smyth* v. *Ames*, 169 U. S. 466, 522.

For the reasons stated, I dissent from the opinion and judgment of the court.

MR. JUSTICE BROWN authorizes me to say that he concurs in this dissent.

MR. JUSTICE WHITE was not present at the argument, and took no part in the decision of the case.