Bryan POINDEXTER, a minor, by Lorraine Poindexter, his mother and next friend et al., Plaintiffs,

v.

LOUISIANA FINANCIAL ASSISTANCE COMMISSION et al., Defendants.

Civ. A. No. 14683.

United States District Court
E. D. Louisiana,
New Orleans Division.

Aug. 26, 1967.

Judgment Affirmed Jan. 15, 1968.
See 88 S.Ct. 693.

See also D.C., 258 F.Supp. 158.

834

A. P. Tureaud, A. M. Trudeau, Jr., New Orleans, La., Jack Greenberg, Henry M. Aronson, New York City, for plaintiffs.

Hugh W. Fleischer, Ray Terry, J. Harold Flannery, U. S. Dept. of Justice, for plaintiff-intervenor.

Victor A. Sachse, Baton Rouge, La., J. J. Davidson, Jr., Lafayette, Sidney W. Provensal, Jr., New Orleans, La., for La. Financial Assistance Comm., E. W. Gravolet, Jr., Jas. R. Leake, Jas. D. Fontain and Lantz Womack.

Frank L. Dobson, Baton Rouge, La., for Louisiana State Bd. of Education.

Walter E. Doane, New Orleans, La., for Ninth Ward Elementary School and Armond J. Duvio, and Carrollton Elementary School Association.

Sydney J. Parlongue, New Orleans, La., for Garden District Academy.

Cy Courtney, New Orleans, La., Richard Cadwallader, Baton Rouge, La., for Mrs. Thelma Deamer, Carroll Leach, Rosetta Jiles and Mrs. Fannie Magee defendant-intervenors.

Before WISDOM and AINSWORTH, Circuit Judges, and CHRISTENBERRY, District Judge.

WISDOM, Circuit Judge:

This class action by Negro schoolchildren and their parents against the Louisiana Financial Assistance Commission

and others [1] attacks the constitutionality of Act 147 of 1962.[2] Under that law the Commission administers a program of tuition grants to pupils attending private schools in Louisiana. The United States intervened as a party plaintiff; [3] directors of four private schools for Negro retarded children intervened as parties defendant.[4]

In an earlier opinion in this case the court disposed of various motions, including the defendants' motion to dismiss for lack of the plaintiffs' standing to sue and a motion to dissolve the three-judge court. Poindexter v. Louisiana Financial Assistance Commission, E.D.La.1966, 258 F.Supp. 158. The matter is now before us on the merits.[5]

\* \* \*

The free lunches and textbooks Louisiana provides for all its school children are the fruits of racially neutral benevolence. Tuition grants are not the products of such a policy. They are the fruits of the State's traditional racially biased policy of providing segregated schools for white pupils. Here that policy has pushed the State to the extreme of using public funds to aid private discrimination endangering the public school system and equal educational opportunities for Negroes in Louisiana.

As certainly as "12" is the next number of a series starting 2, 4, 6, 8, 10, Act 147 fitted into the long series of statutes the Louisiana legislature enacted for over a hundred years to maintain segregated schools for white children.[6] After the Supreme Court's 1954 decision in the School Segregation Cases,[7] the legislature rapidly expanded the series. As fast as the courts knocked out one school law, the legislature enacted another. Each of these laws, whether its objective was obvious [8] or nonobvious, was designed to provide a state-supported sanctuary for white children in flight from desegregated public schools.

■■■ Act 147 of 1962 is unconstitutional. The purpose and natural or reasonable effect of this law are to continue segregated education in Louisiana by providing state funds for the establishment and support of segregated, privately operated schools for white children. The United States Constitution does not permit the State to perform acts indirectly through private persons which it is forbidden to do directly. The evidence before the Court shows that the tuition grants have supplied a heavy predominance of funds needed to establish and maintain post-1954 and especially post-1962 private segregated schools. The Commission's recent decision to reduce its aid to less than 50 per cent of the funds required for operating a school fails to take the curse off the Act. Any affirmative and purposeful state aid promoting private discrimination violates the equal protection clause. There is no such thing as the State's legitimately being just a little bit discriminatory.

1. Other defendants are the Louisiana State Board of Education, the Orleans Parish School Board, and three schools in Orleans Parish, the Ninth Ward Elementary School, the Carrollton Elementary School Association, and the Garden District Academy.

2. LSA–R.S. 17:2951–17:2959. The Court has jurisdiction of this action under 28 U.S.C. §§ 1331, 1343(3), 2201, and 2281.

3. Under 42 U.S.C. § 2000h–2 (Section 902 of the Civil Rights Act of 1964) and under Fed.R.Civ.P. 24.

4. Under Fed.R.Civ.P. 24.

5. The Court described Act 147 of 1962 as a "refined, sophisticated substitute for the earlier grant-in-aid program held unconstitutional", and recognized the standing of the plaintiffs "to probe 'the purpose. mechanics, and effect of the plan' in light of present constitutional standards". 258 F.Supp. 158, 161, 164.

6. On standby is Act 99 of 1967. See Section III C of this opinion.

7. Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. See Brown v. Board of Education, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083.

8. As in Act 256 of 1958, establishing tuition grants for children conditioned on there being "no racially separate public school" in the parish.

## I.

### The Statute

Act 147 of 1962 (LSA–R.S. 17:2951–17:2953) authorizes state tuition grants for children attending "private non-sectarian elementary or secondary schools" in Louisiana. The statute creates the Louisiana Financial Assistance Commission to administer the program. The Commission is composed of three members appointed by the governor.[9] Payments are "by check to the parent or guardian of, or the person standing in loco parentis to, the applicant." The statute is tied in with the public school system in the sense that to receive a grant, the applicants must be "eligible * * * for admission to elementary or secondary schools within the public school system of the state." Applicants must furnish "satisfactory evidence of admissibility to a private non-sectarian * * * school * * * legally constituted and operated under constitution and laws of the state." As thus far administered, each grant amounts to two dollars a day based on an assumed school term of 180 days, or $360, but limited to an amount not to exceed the tuition obligation actually incurred by the applicant.

In 1961 the Legislature transferred 2.5 million dollars from the Public Welfare Fund to the Education Expense Grant Fund to maintain tuition grants.[10] Act 147 authorized the monthly transfer of $200,000 from the Education Expense Grant Fund, supported by sales tax deductions, to a fund to be administered by the Commission. In 1963 the Legislature increased this amount to $300,000 a month.[11]

October 29, 1966, the Commission adopted a resolution stating, in part:

"[T]he Commission has concluded that, except with respect to applicants on behalf of children attending private schools for retarded children, it will not pay tuition grants to applicants whose children attend any private school *predominantly* maintained through such tuition grants. In order to avoid unnecessary disruption of the present classes with consequent injury to the students, this policy shall be effective for school sessions commencing after June 1967."

The resolution was adopted to meet the holding in Griffin v. State Board of Education, E.D.Va.1965, 239 F.Supp. 560 (unappealed) and the definition of "public school" in the Civil Rights Act of 1964.[12] *Griffin* held that state tuition grants are an unconstitutional application of a grant-in-aid law and discriminatory state action *only* when they "predominantly maintain" a segregated school. For purposes of Title IV (Public Education), the Civil Rights Act of 1964, § 401(c), defines "public school" as an institution "operated wholly or predominantly from or through the use of government funds or property."[13] The Commission construes the resolution as authorizing payments to applicants attending a school supported by tuition grants which amount to any sum less than fifty per cent of the school's annual operating costs.

---

9. The three Commission members originally appointed are Senator E. W. Gravolet, Jr. (Chairman), Representative Lantz Womack (Vice-Chairman), and former State Representative James R. Leake (Secretary). Senator Gravolet, Chairman of the Joint Legislative Committee on Segregation, testified that he played a major role in drafting Act 147 and in sponsoring it in the Legislature.

10. Act 10, 2d Extraordinary Session of 1961, LRS–R.S. 47:318.

11. Act 27 of 1963.

12. See Section V C of this opinion.

13. 78 Stat. 241 (1964), 42 U.S.C. § 2000c. Title (Subchapter) IV has two purposes. (1) It authorizes the United States Commission of Education to render technical assistance to public schools in their desegregation problems. (2) § 2000c–6 authorizes the Attorney General to seek an injunction against discrimination by public schools. Section 2000c–8 provides, "Nothing in this subchapter shall affect adversely the right of any person to sue for or obtain relief in any court against discrimination in public education."

## II.

### Purpose and Motive

■ We are not unmindful of the distinction courts draw between "purpose" and "motive". We accept the first Justice Harlan's statement, quoted by the defendants: "In a legal sense the object or purpose of legislation is to be determined by its natural and reasonable effect, whatever may have been the motive of the legislature".[14]

■■ Recognition of the distinction between purpose and motive does not prohibits courts from looking beyond the face of the statute. As we said in Hall v. St. Helena, E.D.La.1961, 197 F.Supp. 649, aff'd 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521, in holding unconstitutional an earlier version of Louisiana's grant-in-aid system:

Irrespective of the terms of a statute, particularly in the area of racial discrimination, courts must determine its purpose as well as its substance and effect. * * * "[A]cts generally lawful may become unlawful when done to accomplish an unlawful end." Western Union Tel. Co. v. Foster, 247 U.S. 105, 115, 38 S.Ct. 438, 62 L.Ed. 1006.

See also the discussion in United States v. State of Louisiana, E.D.La., 225 F. Supp. 353, 361–363. In that case we considered the constitutionality of the Louisiana "understanding" or "interpretation" test as a requirement for registration to vote. We said, "Purpose carries the meaning of Coke's 'true reason' for the law in the light of the situation at which it is aimed."[15] We quoted from a well known lecture by Mr. Justice Frankfurter:

Laws are not abstract propositions. They are expressions of policy arising out of specific situations and addressed to the attainment of particular ends. * * * And the bottom problem is: What is below the surface of the words and yet fairly a part of them?[16]

In the Louisiana Constitutional Convention of 1921 the bottom problem in devising registration provisions was, how to draft registration requirements that would appear to be neutral but would have the necessary effect of keeping any large number of Negroes from voting; the "grandfather" clause had been declared unconstitutional.[17] The Convention's solution was to bring out of limbo the "understanding" or "interpretation" test[18] which the Constitutional Convention of 1898 had considered but rejected in favor of the "grandfather" clause.

There is no doubt that here the bottom problem, the situation at which Act 147 is aimed, is the desegregation of the public schools. The same problem had confronted other sessions of the legislature. Since 1958 the Louisiana legislative solution has been to offer the alternative of so-called "private" schools supported by state tuition grants. Public expressions by the legislators on the subject may or may not reveal the motives that actuated their vote. The Court is not interested in their motives. The Court is interested in their public expressions indicative of the legislative

14. People ex rel. Parke, Davis & Co. v. Roberts, 1898, 171 U.S. 658, 19 S.Ct. 58, 43 L.Ed. 323.

15. Heydon's Case, 3 Co.Rep. 7a, 7b, 76 Eng.Rep. 637 (1584). Cf. "[T]he most universal and effectual way of discovering the true meaning of a law, when the words are dubious, is by considering the reason and spirit of it; or the cause which moved the legislator to enact it." 1 Blackstone, Commentaries 61 (8th Ed. 1778).

16. Frankfurter, Some Reflections on the Reading of Statutes, 47 Col.L.Rev. 527, 533 (1947).

17. Guinn v. United States, 1915, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340.

18. The voter shall be able to (1) "read any clause" in the Constitutions of Louisiana and of the United States and "give a reasonable interpretation thereof", or (2) if unable to read, the voter shall be able "to understand and give a reasonable interpretation of any section of either Constitution when read to him by the registrar." La.Const. of 1921, Art. VIII, §§ 1(c), 1(d).

purpose, as the legislators understood the purpose of the legislation.

Time and again under the equal protection clause, because of the purpose and effect of a law, courts have struck down state laws fully within the power of the State to enact. See particularly Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110, and Grosjean v. American Press Co., 1936, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660. *Gomillion* involved the unchallengeable power of a state legislature to determine municipal boundaries; the face of the law was flawless. "When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right." 364 U.S. at 347, 81 S.Ct. at 130. *Grosjean* involved nothing more than a graduated tax on newspaper and theatre advertising. Under its fair appearance was the ugly fact that the legislature enacted the law to punish New Orleans newspapers critical of Huey Long. A unanimous Court said:

> [The tax] is bad because, *in the light of its history and of its present setting*, it is seen to be a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties. 297 U.S. at 250, 56 S.Ct. at 449.

### III.

#### The Purpose as Shown in the History and Present Setting of Act 147

Prompted by *Grosjean*, we consider first the purpose of Act 147, "in the light of its history and present setting". We have used the same approach in considering Louisiana legislation dealing with voting rights. See United States v. State of Louisiana, E.D.La.1963, 225 F.Supp. 353.

A. The Louisiana Constitution of 1845, replacing that of 1812, and the Constitution of 1852 provided for "free public schools". In 1847 the legislature enacted the first Louisiana public school act, providing at least three years schooling for "any youth (white, of course) under 21".[19] At that time and until 1864, the Black Code of Louisiana and other laws levied heavy fines and severe punishments on those who taught slaves to read and write.[20] In 1864 General Nathaniel P. Banks, Commander of the United States forces in the Department of the Gulf, stationed in New Orleans, called a Constitutional Convention, although only the southern half of the State was under Union military control. The Convention approved a constitution that for the first time provided "for the education of *all* children of the State". Apparently, this provision contemplated separate schools for Negro children.[21] When the legislature took no action, General Banks, on his own responsibility, created a Committee on Enrollment that established the first public schools for Negroes in Louisiana. The following year the Freedman's Bureau took over the administration of these schools.[22] In 1868 "radical" Reconstruction brought a new constitution. This one provided for public schools "without distinction of race, color, or previous condition" and

19. Fay, The History of Education in Louisiana 69 (Washington; U.S. Bureau of Education, 1898).

20. Porter, The History of Negro Education in Louisiana, 25 La.Hist.Q. 728, 731 (1942). See also Woodson, The Education of the Negro Prior to 1861, 3–4, 11. The law tolerated private schools for free people of color "by a significant silence on the subject" aided by public opinion. Willey, Education of the Colored Population of Louisiana, 33 Harper's New Monthly Magazine 246 (1866). See also Rousseve, The Negro in Louisiana, 42–55 (New Orleans 1937); Desdunes, Nos Hommes et Notre Histoire (Montreal 1911).

21. Debates in the Convention for the Revision and Amendment of the Constitution of the State of Louisiana, 3, 33–34 (New Orleans 1864).

22. See Bentley, A History of the Freedman's Bureau (Philadelphia 1955); Swint, The Northern Teacher in the South, 1867–1870 (Nashville 1941).

declared, there "shall be no separate school or institutions of learning established exclusively for any race by the State of Louisiana". (Art. 135.) Under this unprecedented organic law, the Louisiana legislature adopted Act 178 of 1869 establishing mixed public schools. This statute failed to bring about any substantial school desegregation. There were some mixed schools in New Or-leans, but there were no such schools in the rural parishes. Professor Edwin W. Fay, author of an authoritative study of education in Louisiana, states, "In 1870 almost no white children were attending the public schools".[23] As a result, the Peabody Fund, established to aid public education, in Louisiana was "administered at this time for the benefit of whites [in private schools] exclusively".[24] The

23. Fay, History of Education in Louisiana 107.

Historians, with one exception, agree with Professor Fay. See for example, Harris, The Story of Public Education in Louisiana 30–31, 51 (New Orleans 1924) and Porter, History of Negro Education in Louisiana, 25 La.Hist.Q. 728 (1942). The one exception is Professor Louis R. Harlan, who limited his inquiry to New Orleans in the seventies. In a recent article he concluded that "the New Orleans public schools during the Reconstruction period underwent substantial racial desegregation over a period of six and a half years [1868–1875], an experience shared by no other southern community until after 1954 and by few northern communities at the time". He found evidence that between 500 and 1000 Negroes and several thousand whites attended mixed schools at the height of desegregation (1874). The peak enrollment in New Orleans schools was 26,250 (1875). Harlan, Desegregation in New Orleans Public Schools during Reconstruction, 67 Am.Hist.Rev. 663 (1962).

In Robert M. Lusher's Report of the State Superintendent of Public Education for 1866, 1–30, there is no mention of Negro education. In that same year Thomas W. Conway testified: "The feeling there is unanimous that they shall not own an acre of land or have any schools. They are more hostile to the establishment of schools than they are to owning lands. They had broken up some of our schools at the time of my departure, and since then I have official reports from those who have charge of the schools that upon the withdrawal of the military from the parishes of St. Mary and Lafourche the freedmen's school-houses in those parishes were, before night, burnt or pulled down, the schools disbanded, and the teachers frightened away." Report of Joint Committee on Reconstruction, 1866, Part II, p. 86. Conway, a white officer. (Chaplain) with the 79th Regiment of U. S. Colored Infantry, was Commissioner of the Freedman's Bureau in Louisiana, later (1869) State Superintendent of Schools and Chairman of the State Board of Education. In his first report Conway stated: "Compulsory mixed schools renders the whole system obnoxious. The law should be amended so as to allow liberty of choice." Report of the Commissioner of Education for the Year 1870, p. 150. The following year he reported "that the former 'slaveholding aristocracy,' who from the first bitterly opposed this plan, now accepted the fact because they could not prevent, and in many instances are now apparently lending their interests and influence cheerfully to the establishment of schools for the colored people, but they do not themselves send—they prefer rather as always before to educate their children in private institutions. * * * As to the poor whites, they refused to apply for admission even though 'good schools, attended by colored children, have flourished right among them for upward of two years.'" Annual Report of the State Superintendent of Public Education for the Year 1870, pp. 119–20 (1871). Harris writes: "White and negro parents would agree among themselves that only white children would attend certain schools, while only negro children would attend certain other schools; if only one school were provided in a community, the white people would not patronize it * * *; occasionally, separate rooms were provided in the same school for the two races; and now and then, negro children were prevented from attending certain schools, even though such action resulted in breaking up the schools. It seems fairly certain that there were no mixed schools in the country parishes." Harris, The Story of Public Education in Louisiana 78 (New Orleans 1924).

24. Dr. Barnas Sears, agent of the Fund, answering the State Superintendent's request for funds, wrote: "In the distribution of our fund I should be most happy to cooperate with the State authorities. But I understand that the State public

Constitution of 1870 was adopted when the Reconstruction period in Louisiana was far from being over, but in effect the Constitution gave its blessing to the dual system of segregated schools. This Constitution substituted the language of 1864 for the language of 1868. "By 1877 separate schools had been established for the two races and in that year there were 54,390 pupils in attendance in the public schools, while the number capable of enrollment was 266,033".[25] In 1898, Louisiana, along with other southern states, for the first time specifically adopted Jim Crow provisions.[26] Article 248 of the Constitution of 1898 provided for "free public schools for the white and colored races, separately established". The Constitution of 1913 and the present Constitution of 1921 carried forward similar language.

In 1954, a few months after the Supreme Court decided the first *Brown*

case desegregating public schools, Louisiana amended Article XII, Section 1 of the Constitution of 1921. This amendment expressed the state policy on segregated schools:

"All public elementary and secondary schools in the State of Louisiana shall be operated separately for white and colored children. This provision is made in the exercise of the state police power to promote and protect public health, morals, better education and the peace and good order in the State, and not because of race. The Legislature shall enact laws to enforce the state police power in this regard." [27]

The Legislature promptly enacted Acts No. 555 and 556 of 1954. Act 555 carried out the constitutional requirement of separate schools and provided penalties for failing to observe it. Act 556 provided for the assignment to a school

schools [of Louisiana] are so organized that the greater part of the white population are unwilling to send their children to them, and that consequently the benefit of the money goes * * * to the colored children chiefly. * * * It is well known that we are helping the white children of Louisiana, as being the more destitute, from the fact of their unwillingness to attend mixed schools." Conway rejoined: "It will be seen by the letter of Dr. Sears that, owing to the representations made by Mr. Lusher, the Peabody fund, so far as it is employed in Louisiana, is used in opposition to the public-school system of the State. With all respect for the judgment of the agent of the Peabody fund, it may be doubted whether an unwillingness to avail themselves of the advantages offered by the public-school system constitutes in any true sense 'destitution.' While as a fact the number of white children in our public schools is threefold that of children of color; the greater wealth of the white portion of our population enables them to establish and to maintain *private schools for their children*, and were the number who do derive the advantages of education added to those white children in attendance in our public schools, it would make a number at lease quadruple that of all colored children now enjoying school privileges in this State. It is not, therefore, in any sense true that the white children in Lou-

isiana are, 'from the fact of their unwillingness to attend mixed schools,' the 'more destitute.' The administration of the Peabody fund on the basis of such a supposition has a tendency to foster the evil which deprecates, inasmuch as it rewards by its benefactions those who refuse to gain an education unless it is obtained in harmony with the spirit of caste; while, on the other hand, by providing educational facilities for white children, it enables the opponents of the public-school system to deny school facilities to the colored children without involving the others in the loss and injury inflicted." Report of January 30, 1871. Both are quoted in Fay, pp. 106, 107.

25. Fay, History of Education in Louisiana 107. "Redemption" of Louisiana was part of the Hayes-Tilden compromise in 1876. See Woodward, Reunion and Reaction (1951).

In Bertonneau v. Board of Directors of City Schools, 3 Fed.Cas. page 294, No. 1361, 3 Woods 177 (Circuit Court, D.La., 1878) the court held that a city ordinance segregating schools in New Orleans was not a denial of equal protection where the public school were of equal excellence for all children.

26. Woodward, The Strange Career of Jim Crow (2nd Rev. Ed. 1966).

27. The language beginning "This provision * * *" was added.

of each pupil each year by the superintendent of schools of the district in which the pupil lived. In February 1956 this Court held that both the amendment to Article XII Section 1 and the two statutes were invalid, and enjoined the Orleans Parish School Board from requiring and permitting segregation in the parish public schools. Bush v. Orleans Parish School Board, E.D.La. 1956, 138 F.Supp. 337, aff'd 242 F.2d 156, cert. denied 354 U.S. 921, 77 S.Ct. 1380, 1 L.Ed.2d 1436.

The Louisiana Legislature immediately enacted a new package of laws. Act 319 of 1956 purported to "freeze" the existing racial status of the public schools in Orleans Parish and to reserve to the legislature the power of racial reclassification of the schools. The Court declared this "legal artifice" unconstitutional on its face. Bush v. Orleans Parish School Board, E.D.La.1958, 163 F. Supp. 701, aff'd 5 Cir., 268 F.2d 78.

In 1958 the legislature enacted another bundle of school laws. Professor Charles A. Reynard of Louisiana State University has described these as follows:

> Adhering to its steadfast course of circumventing the Supreme Court's decisions forbidding the enforced segregation of the races in public education, the Legislature took steps to provide for the closing of public schools threatened with desegregation and authorized a system of publicly financed private education in lieu thereof. A pupil assignment law, applicable to the public schools, was also adopted. These measures were designed to fill the void created by the decisions of the federal courts invalidating acts adopted at the 1956 session, * * * which, in turn had been adopted to replace legislation passed in 1954, declared unconstitutional by the courts. Reynard, Legislative Symposium: Segregation, 19 La. L.Rev. 114 (1958).

Act 257 provided in detail for the establishment of educational cooperatives. Act 258 established the first Louisiana system of grants-in-aid for "children attending non-sectarian non-public schools". Its purpose was obvious: The aid was conditioned on there being "no racially separate public school" in the parish. The grant system was to be administered jointly by the State Board of Education and the parish or city school boards.

By 1959 it was apparent to all that the Orleans Parish School Board could not take independent action to carry out the Court's order of February 15, 1956, requiring it to desegregate public schools in New Orleans. July 15, 1959, therefore, the Court ordered the Board to file a desegregation plan by March 1, 1960. Later, the Court extended the deadline to May 16, 1960. When the Board failed to file a plan, the Court, on May 16, 1960, entered an order setting forth a plan of desegregation for the Orleans Parish School Board to follow. The plan called for the desegregation of the first grade in September 1960.

The Louisiana Legislature promptly built additional barricades. Act 333 of 1960 prohibited the furnishing of free books, school supplies, school funds or assistance to integrated schools. Act 495 authorized the Governor to close integrated schools. Act 496 purported to "freeze" the racial classification of public schools and reserve to the Legislature the power to change this classification. Act 542 authorized the Governor to close the public schools in case of riots and disorder.

The tempo of resistance increased. July 29, 1960, the Attorney General of Louisiana obtained an injunction in the state courts restraining the Orleans Parish School Board from desegregating its schools. August 17, 1960, the Governor of Louisiana, acting under Act 495 of 1960, took over control of the Orleans public schools. August 27, 1960, a three-judge district court struck down these actions along with Acts 333, 495, 496, and 542 of 1960, Act 555 of 1964, Act 319 of 1956, and Act 256 of 1958. Bush v. Orleans Parish School Board, E.D.La. 1960, 187 F.Supp. 42.

At this point, the Orleans School Board conferred with the district court.

In public session the Board adopted a grade-a-year plan, postponed to November 14, 1960, and announced its intention to comply with the Court's orders.

The Board's compliance brought on five extraordinary sessions of the legislature within four months. Among other actions, the Legislature seized the funds of the Orleans Parish School Board; forbade banks to lend money to this Board; removed as fiscal agent for the state the Bank which honored payroll checks issued by the Orleans Board; ordered a school holiday on November 14, 1960; discharged four of the five Orleans Board members; later repealed the Act creating the Board, then twice created a new School Board for Orleans Parish; and still later discharged the Superintendent, dismissed the Board's attorney, and attempted to require that the State Attorney General be counsel for the Board. The courts declared these and other related acts unconstitutional. Bush v. Orleans Parish School Board, E.D.La., Nov. 30, 1960, 188 F.Supp. 916; Bush v. Orleans Parish School Board, E.D.La., March 3, 1961, 191 F.Supp. 871; and Bush v. Orleans Parish School Board, E.D.La., May 4, 1961, 194 F.Supp. 182.

Act 3 of the Second Extraordinary Session of 1960 was the Legislature's second version of grants in aid. This law differs from Act 258 of 1958, which it repealed, in two respects. First, the legislature did away with the provision that availability of tuition grants was dependent on the integration of the public schools in the parish. Second, it restricted grants to non-profit schools. The administration of the grant system continued to be the joint responsibility of the State Board of Education and the parish or city school boards. On the day the Senate passed Act 3, State Senator E. W. Gravolet described the bill as designed to "dove-tail" with Act 257 of 1958, which authorized educational cooperatives, and commented that the grant-in-aid principle had been used successfully for a private school system in Prince Edward County, Virginia.[28] At a meeting of the White Citizen's Council in New Orleans on December 15, 1960, the Secretary of State of Louisiana, Wade O. Martin, predicted that Louisiana would go from public to private schools so that every child would have a check or money to go to the school of his choice; the white schools would accept white students, and the "black schools" would accept Negro students.[29] In the Louisiana House of Representatives, December 21, 1960, Representative Triche of Assumption Parish argued that the grant-in-aid system was the most effective weapon against the integration of public schools and that the tax was needed to continue the fight for a segregated school system in Louisiana.[30]

In 1961 the Court of Appeals for the Fifth Circuit affirmed orders requiring the desegregation of 'public schools in East Baton Rouge and St. Helena Parishes. On the same day the Governor of Louisiana called the Second Extraordinary Session of the Legislature for 1961. He certified as emergency legislation what became Act 2 of that session. Act 2 masqueraded as a local option law. It gave each parish or municipal school board the "option" to close its schools if a majority of the qualified voters in the parish or municipality voted in favor of such action. The school board was then authorized to dispose of its property for such consideration as it deemed appropriate. Act 257 of 1958 had created educational cooperatives which could acquire the property and then operate schools with the state money furnished by the grant-in-aid program provided for in Act 3 of the Second Extraordinary Session of 1960. In Hall v. St. Helena the Court characterized the option for a poor parish such as St. Helena as an option to attend segregated schools—or no schools. 197 F.Supp. 649,

28. The New Orleans Times-Picayune, December 5, 1960.

29. The New Orleans Times-Picayune, December 18, 1960.

30. The New Orleans Times-Picayune, December 22, 1960.

aff'd per curiam, 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521.

Act 9 of the 1961 Second Extraordinary Session of 1961 transferred $2,500,-000 from the Public Welfare Fund to the Education Expense Grant Fund for grant-in-aid use. Act 10 of the same session transferred $200,000 monthly from the sales tax collections to the same fund for the same purpose.

In Hall v. St. Helena Parish School Board, E.D.La. 1961, 197 F.Supp. 649, aff'd per curiam, 368 U.S. 515, 82 S.Ct. 529, holding the grants in aid unconstitutional, the Court stated:

> Under Act 3 * * * the parish school boards would continue to supervise the "private" schools, under the State Board of Education, by administering the grant-in-aid program of tuition grants payable from state and local funds. * * *

This analysis of Act 2 and related legislation makes it clear that when the Legislature integrated Act 2 with its companion measures, especially the "private" school acts, as part of a single carefully constructed design, constitutionally the design was self-defeating. Of necessity, the scheme requires such extensive state control, financial aid, and active participation that in operating the program the state would still be providing public education. [The state would not be doing business at the old stand, but the state would participate as the senior and not silent partner in the same sort of business.] The continuance of segregation at the state's public-private schools, therefore, is a violation of the equal protection clause.

This brings us to the 1962 session. First, the legislature repealed outright the state's compulsory school attendance law, Act 128. (Two years before, in Act 28 of 1956, the law was made inapplicable in a parish where the public school system had been ordered to integrate.) Act 342 of 1962 appropriated funds for the schools of St. Bernard Parish to compensate for expenses incurred in providing facilities for pupils who were not residents of St. Bernard; most of these were white students who had left the desegregated schools in neighboring Orleans Parish. Act 67 of 1962 purported to restrict the right to sue parish school boards, except by authorization of the Legislature.

This was the background and setting when the Louisiana Legislature enacted the statute under attack in this case. The Act transfers administration of tuition grants from the Board of Education to the Louisiana Financial Assistance Commission, provides that tuition grants be made directly to the parent rather than to the parent and school jointly and, to attrach entrepreneurs, waives the requirement that schools attended by students receiving tuition grants be non-profit organizations. In all other significant respects Act 147 is substantially identical with the 1960 tuition grants statute.

B. In 1962 the legislative sponsors of Act 147 and some of the persons directly responsible for the operation of the grant-in-aid program were not reluctant to announce the purpose of the legislation.

State Senator E. W. Gravolet, Jr., was Senate Floor leader for the passage of the Act, vice-chairman of the Joint Legislature Committee on Segregation, and Chairman of the Financial Assistance Commission from its inception. He stated:

> "It was primarily because of that federal court decision, [Hall v. St. Helena Parish School Board] combined with the one in Virginia that the Louisiana Legislature took away the administration of the tuition grants from the State Board of Education and the local school boards and created a new commission to disburse the tuition grants directly to the child, following the constitutional theory that grants directly to the child by the states were legal.

> The federal court went out of its way in the St. Helena case to point out that grant-in-aid could be attacked as being state action under the 14th

amendment of the United States Constitution if they were administered by the local school board, because the various private schools would be classified by federal courts as private-public schools." [31]

Immediately after Act 147 had been passed, Senator Gravolet described the establishment of the defendant Commission as a means to give citizens a choice whether they want to send their children to desegregated schools. He said, further, that if any large number of Negroes enroll at either public or parochial schools "we may have a lot of makeshift cooperative schools." [32] His reference was to so-called educational cooperatives, private nonsectarian schools, the establishment of which were made possible by LSA-R.S. 17:2801, enacted on the same day as Act 258 of 1958, the first tuition grant statute. Shortly thereafter, Gravolet, as newly appointed Chairman of the Commission, said that he understood the Commission would establish a brand new state department with a permanent staff to channel state funds to applicants seeking to avoid integrated schools by attending private nonsectarian schools. [33]

In a letter which Senator Gravolet signed as Chairman of the Commission, distributed in January of 1964, during the second gubernatorial primary election, he stated, in full:

I enclose a New Orleans clipping showing Morrison's [34] statement that he is unalterably opposed to state grant-in-aid to help your children go to a private segregated school of your choice, instead of having to go to a racially integrated school.

Your only hope to continue to get school checks to help your children go to private schools is by electing John McKeithen governor on Saturday, January 11.

> E. W. Gravolet, Jr.
> Chairman
> Louisiana Financial
> Assistance Commission

The Vice-Chairman of the Commission, Representative Lantz Womack, stated to a Citizens Council meeting in New Orleans on December 4, 1963, that the grant-in-aid program was started in 1958 "but very little use was made of it until the integration move began in New Orleans." [35]

The chairman of the State Sovereignty Commission and advisor to the then Governor Davis, Frank Voelker, Jr. stated several months prior to the passage of Act 147, that the grant-in-aid system would be transferred from the State Department of Education to a new and separate agency. [36] He further stated, "If the present grants in aid is carried to the federal courts it probably would be knocked out because it is really the state operating the schools." [37]

After a bond issue to aid in financing the tuition grant program had been defeated at the polls in November of 1962, James D. Fountain, then assistant director of the defendant Commission, said, "I think we can operate within our present revenues, unless there is a mass integration effort." [38]

C. The present Louisiana tuition statute, like its counterpart in Alabama, was "designed to fill the vacuum left by this Court's injunction against the [earlier] tuition statute". Cf. Lee v. Macon County Board of Education, M.D. Ala.1967, 267 F.Supp. 458, 477. Waiting in the wings to play the role Act 147 is

31. New Orleans Times-Picayune, December 5, 1963.

32. The New Orleans Times-Picayune, August 1, 1962.

33. The New Orleans Times-Picayune, August 1, 1962.

34. De Lesseps Morrison, then Mayor of New Orleans, candidate for Governor in the Democratic run-off primary.

35. New Orleans Times-Picayune, December 5, 1963.

36. New Orleans Times-Picayune, March 11, 1962.

37. Id.

38. New Orleans Times-Picayune, November 9, 1962.

forbidden to play is Act 99 of 1967. The 1967 substitute provides "financial aid scholarships to needy children enrolled in private non-sectarian elementary and secondary schools located in this state *whose parents choose not to enroll said children in the public education facilities of this state*", because they are "mindful of the increase in juvenile delinquency, school dropouts and juvenile crime rates * * * mindful that the parent, not the State of Louisiana, shall be the determining force which shall decide on the type of education ultimately received by the child * * * [but] lack the finances which would enable them to enroll their children in private schools."

Thus, for a hundred years, the Louisiana legislature has not deviated from its objective of maintaining segregated schools for white children. Ten years after *Brown,* declared policy became undeclared policy. Open legislative defiance of desegregation orders shifted to subtle forms of circumvention—although some prominent sponsors of grant-in-aid legislation have been less than subtle in their public expression. But the changes in means reflect no change in legislative ends.

## IV.

### Effect of Act 147

The problem of fairly ascertaining the effect of a statute becomes complicated when the degree of a state's involvement in private discrimination is nonobvious. In Burton v. Wilmington Parking Authority, 1961, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45, the Supreme Court observed, "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." 365 U.S. at 722, 81 S.Ct. at 860.

In our earlier opinion in this case we held that "any amount of state support to help found segregated schools or to help maintain such schools is sufficient to give standing to Negro school children to file the kind of complaint filed in this case." 258 F.Supp. at 164. We concluded, however, largely because of *Burton:*

> "This case should be decided after a full trial on the facts. The extent to which the tuition grants contributed to the founding of the quasi-public schools, in dollars and as a stimulus, the extent to which the grants now contribute to the support of the quasi-public schools, the extent of state involvement and control, and other factors relevant to state action can be determined only by a trial on the merits."

The inevitable effect of the tuition grants was the establishment and maintenance of a state-supported system of segregated schools for white children, making the state a party to organized private discrimination.

A. There are 67 school districts in Louisiana, 15 of which were not, at the opening of the 1966–67 school year, under court order to desegregate. There are 79 private, nonsectarian schools in nine school districts. In seven of these school districts private schools were formed after enactment of Act 147: East Feliciana, East Baton Rouge, Jefferson, Orleans, St. Tammany, Bogalusa (Washington), Plaquemines. In these districts public schools are desegregated by court order.[39] Of the 79 schools, 62 are for normal children: 60 for white pupils, two for Negro pupils. Each of these schools is segregated.[40]

39. Jenkins v. City of Bogalusa School Board, Conley v. Calcasieu Parish School Board, United States v. Caddo Parish School Board, Davis v. East Baton Rouge Parish School Board, George v. East Feliciana Parish School Board, Dandridge v. Jefferson Parish School Board, Bush v. Orleans Parish School Board, United States v. Plaquemines Parish School Board, Smith v. St. Tammany Parish School Board.

40. One school, which charges the highest tuition in the State, Newman School in New Orleans, established in 1903, publicly announced that it will accept qualified

Before 1954 there were 16 private schools in the state, all but one located within the New Orleans Metropolitan area. After 1954 but before enactment of the 1960 tuition grant statute, nine additional schools were started. Between enactment of the 1960 law and enactment of Act 147 in July 1962, eight more private schools came into being. Between the enactment of Act 147 and the time of the trial of this case, 36 additional schools for white children began operation. Thus 44 of the 60 private schools for white children were formed after the first desegregation of public schools in 1960.

B. (1) The amounts the newly organized schools charge for tuition show that these schools could not have come into existence and could not have continued to exist without the state's grants in aid. This inference finds especially strong support in the tuition charged by post-1962 schools. The Commission set tuition grants at two dollars a school day for each recipient, or $360 on an assumed school year of 180 days.[41] The following table shows the close correlation between the amount of the grant and the amount the schools charged for tuition:

## POST–1954 PRIVATE SCHOOLS

| White, Non-Retarded School and Date School Began | Tuition/Year | No. of Students and Recipients * |
|---|---|---|
| Agnew Town and Country Day School (1957) | $360 | 245 (72) |
| Edith Ashley School (1962) | 405 | 36 (36) |
| Aurora Gardens Academy (1964) | 450–675 | 508 (455) |
| Belle Chasse School Association River Oaks Academy (1966) | 450 | 1,251 (1,222) |
| Boothville-Venice School Association Seaway Academy (1966) | 450 | 295 (347) |
| Buras School Association, Delta Heritage Academy (1966) | 450 | 641 (634) |
| Carrollton Private School (1962) | 360 | 123 (118) |
| Child's World School (1963) | 360 | 99 (109) |
| Connor-Parkview School (1956) | 400–450 | 125 (127) |
| John Curtis Christ School (1962) | 360–450 | 650 (595) |
| D and D Private Elementary School (1963) | 432–468 | 31 (29) |
| East Bank School Association, Promised Land Academy (1966) | 450 | 251 (261) |
| Ecole Classique (1955) | 550–625 | 526 (406) |
| First Educational Co-operative, Mirabeau Elementary School (1962) | 360 | 173 (157) |
| Garden District Academy (1959) | 450–750 | 125 (86) |
| Gentilly Private School (1962) | 540 | 301 (289) |
| Grawood Christian School (1960) | 360 | 246 (215) |
| Hardwicke-MacMasters School (1963) | 540 | 162 (241) |

students without regard to race. Dr. Isabel French, the principal of New University School, a post-1962 school, testified that she had intended adopting an open policy; Newman had "beaten her to it".

41. Before adoption of its resolution of October 29, 1967.

* The number of recipients is stated in the parenthesis. In each instance this number represents the total number who, at any time during the 1966–67 school year, received a tuition grant from the Commission.

| White, Non-Retarded School and Date School Began | Tuition/Year | No. of Students and Recipients * |
|---|---|---|
| Helena M. Hart Memorial School (1962) | 390–445 | 184 (168) |
| Jefferson Academy (1965) | 360 | 192 (179) |
| Kehoe Academy (1962) | 375–400 | 400 (313) |
| Kehoe-France School (1965) | 400 | 62 (58) |
| Lake Castle Private School (1963) | 385–400 | 340 (290) |
| Lake Charles Christian Institute (1961–62) | 378 | 64 (52) |
| Lakewood Private Elementary School (1960) | 350–420 | 190 (166) |
| James Madison High School (1963) | 405–450 | 175 (211) |
| Marquez Learn and Play (1956) | 360 | 72 (17) |
| James H. Muhpry School (1962–63) | 468 | 106 (83) |
| New Orleans Hebrew Academy (1960) | 400 | 7 (4) |
| New University School (1964) | 450 | 200 (275) |
| Walter Parker Elementary School (1966) | 360 | 68–70 (115) |
| Port Sulphur School Association Rudolph McBride Academy (1966) | 450 | 193 (235) |
| Prytania Private School (1960) | 480 | 674 (636) |
| Riverview Preparatory School (1961) | 380 | 574 (591) |
| Silliman Private School (1965) | 360 | 125 (146) |
| Sycamore Progressive School (1966) | 405 | 66 (65) |
| Tamanny (1966) | 400 | 135 (121) |
| United Elementary School (1962) | 360 | 135 (65–66) |
| Uptown Elementary School (1962) | 380 | 128 (129) |
| Vieux Carre School (1957) | 360 | 55 (26) |
| Marjorie Walters (1960) | 500 | 452 (408) |
| Walters, Inc. (1956) | 1,710 (including room & board) | 70 (43) |
| Wilde Private Elementary School (1960) | 360 | 117 (119) |
| Wonderland School (1960–62) | 450 | 120 (112) |
| Seaway Academy of Venice (1966) | 450 | 295 (347) |

———◆———

The tuition at most of the pre-Brown non-special private schools, as one would expect, is much higher than the tuition at the post-Brown schools. This is the range of tuition at the old-line schools: $750–1000; $765–1000; $660–950; $680–870; $650–800; $612–676; $580–650; $462–714; $430–600; $430–600; $425–480; $380–410; $325–360; $360; $300–380.

(2) There are six private schools for retarded white children in Louisiana. Three of these schools were formed after 1960; one was formed in 1957. These four schools charge the following tuition fees: $540, $360, $360, and $675.

There are ten private schools for retarded Negro children. Two were formed in 1966, four in 1963, one in 1959, two in 1956, and one in 1952. One of the schools charges tuition of $396 a year; all the others charge $360 a year or two dollars a day. In each school the number of tuition grant recipients exceeds or nearly equals the number of enrolled pupils.

* The number of recipients is stated in the parenthesis. In each instance this number represents the total number who, at any time during the 1966–67 school year, received a tuition grant from the Commission.

Again we draw the inference that the state's tuition grants were directly responsible for the founding of most of the post-Brown special schools and that these schools continue to exist because of the state's educational policy of segregation.

C. The statistical tables in Appendix A show that the state is becoming increasingly involved in supporting private segregated schools. The total number of recipients of tuition grants has increased from 7,093 in 1962–63 to 15,177 in 1966–67. As noted earlier, Act 147 initially authorized the monthly transfer of $200,000 from the education expense grant fund (Act 10, 2nd Extraordinary Session of 1961, LSA–R.S. 47–318), supported by sales tax deductions, to a fund to be administered by the Commission. In the 1963 fiscal session the legislature increased this amount to $300,000 a month.

D. The directors and principals of thirty-two private schools were deposed and questioned about their admissions policy. All but six were equivocal in their statements. The statements of many of these principals that they maintained no policy as to the admission of Negroes must come as a surprise and shock to the parents who have children attending these schools.[42] We find such statements incredible.

Two others, while stating that they would accept a Negro applicant who met their requirements, said that their schools had very stringent social and moral qualifications. Indeed, the Garden District Academy requires, as a prerequisite to admission, the recommendations of two patrons of the school. All of the patrons are white. A similar requirement, maintained by the University of Mississippi was held to constitute racial discrimination in Meredith v. Fair, 5 Cir. 1962, 298 F.2d 696, 701.

Of the six who gave definite answers, five stated that their schools were open only to Caucasians. The remaining deponent stated that she would accept any Negro child who met the standards required of white students.[43]

More credible is the testimony of Charles LaCoste, former director of the Carrollton Elementary School. He testified that the basic purpose for the organization of the school was to avoid public school desegregation and that the existence of tuition grants allowed that purpose to be accomplished. Further, he testified that after public schools were desegregated in New Orleans, his group met with Armond J. Duvio, one of the chief organizers of private schools in New Orleans. In these meetings, the group discussed tuition grants and public school desegregation in relation to the formation of the private schools.

E. Two examples, one of a single school and the other of a parish-wide system, illustrate the close relationship between the state's grants-in-aid and the formation of private segregated schools for white children: (1) The Ninth Ward Elementary School, now the Riverview Preparatory School; and (2) Plaquemines Parish.

(1) Mr. Armond Duvio withdrew his child from the Frantz Elementary School in New Orleans November 14, 1960, the day that school was desegregated under the court order issued in Bush v. Orleans Parish School Board. Most of the other white parents similarly boycotted the Frantz School. Mr. Duvio then made arrangements with Mr. Joseph Davies, the Superintendent of Schools in St. Bernard Parish, for a school to be operated exclusively for the benefit of those white students boycotting the Frantz Elementary School and McDonough Nineteen Elementary School, the other desegregated school in New Orleans at that time. The St. Bernard Parish School system supplied the teachers, textbooks and other assistance.

In the following school year, 1961–1962, Mr. Duvio established the Ninth Ward Elementary School for white students. Five Hundred white students attended that school during its first year.

---

42. See footnote 40.

43. See footnote 40.

The Commission sent tuition grants for all of the students to a post office box maintained by the school. At that time the tuition was $1.67 a day, the exact amount received from the tuition grant program, at that time administered by the State Department of Education and the local school boards.

Since the 1962–1963 school year, the Ninth Ward Elementary School has been financed by tuition grants administered by the defendant Commission. Starting in that school year, the tuition charge became the same as the amount available from the defendant Commission—$360 a year.

(2) A school desegregation suit was filed against the Plaquemines Parish School Board and its Superintendent, on July 19, 1966. Shortly thereafter public meetings were held in four of the then all-white public schools in Plaquemines Parish. At each of these meetings, Leander H. Perez, Sr., President of the Plaquemines Parish Commission Council, was introduced by the respective school principals. Mr. Perez advised the people that he had dedicated his life to opposing the integration of the schools; that the white people in a school system in Virginia had set up private schools for their children to avoid integration, and that these private schools were working well; that the Parish was considering the establishment of private schools. On August 5, 1966, the District Court ordered the Commission Council, its president, Leander H. Perez, and its members added as defendants upon a showing by the United States that school properties had been transferred from the School Board to the Commission Council on July 8, 1966. On the same day the Court issued a temporary restraining order enjoining all the defendants from disposing of such school properties.

August 26, 1966, the Court entered a preliminary injunction providing for the desegregation of six grades. About 174 of 1900 Negro school-age children chose to attend the five previously all white schools in the parish.

As a result of the Court's desegregation order, parents of white students instituted a boycott of the formerly all-white schools of Plaquemines Parish. As of September 26, 1966, the attendance at the formerly all-white schools of Plaquemines Parish, as compared with the 1965–1966 school year, decreased as follows:

|  | 1965–66 | 9/26/66 |
| --- | --- | --- |
| Belle Chasse High School | 1,632 | 125 |
| Buras High School | 1,895 | 1,175 |
| Port Sulphur High School | 935 | 721 |
| Boothville-Venice High School | 821 | 500 |
| Woodlawn High School | 247 | 0 |

Before the Court's desegregation order there were no nonsectarian private schools operating in Plaquemines Parish. After suit was filed, private school organizations were formed in each of the areas in Plaquemines Parish where public schools are located. September 3, 1966, Leander H. Perez, Jr., District Attorney for Plaquemines Parish, made the following statement in reference to his responsibility to enforce the criminal statute requiring that parents send their children to school.

To elaborate on the statement by W. C. Hohmann to the effect that parents cannot keep their children out of public schools without a good excuse, I, as district attorney, take it as my duty to the people of Plaquemines Parish to inform them that if parents are planning to set up private schools for their children, and there is some delay involved, I will not prosecute parents for not sending their children to public schools. I consider a delay of two months, as was occasioned last Sep-

tember due to Hurricane Betsy when the schools remained closed, a reasonable time within which to send their children to private schools.[44]

Because of the large number of applicants from Plaquemines Parish, the Louisiana Financial Assistance Commission established offices in Belle Chasse and Buras in that Parish for the distribution of grant-in-aid application forms. The office remained open during the formation and construction of the private schools in Plaquemines Parish.

Five private nonsectarian schools were established in Plaquemines Parish in September, October, and November 1966. During this period, the former principals of the public schools resigned to become principals of the private schools. These men encouraged the public school teachers to resign by extolling the virtues of private schools as compared with the public schools. The attorney for the Plaquemines Parish School Board informed the teachers that the future of the public school system appeared terribly bleak. These and other measures resulted in various faculty resignations from the public schools. A great majority of the private school teachers and other staff members came directly from the public schools. The record shows that at least 88% of the students attending the new private schools in Plaquemines Parish formerly attended the public schools of that parish.

F. The Commission has been fortunate in having an able, fair, and conscientious Director (now Assistant Director), James B. Fountain. He and the Commission have tried but found it impossible to eliminate state involvement in the operations and management of private schools. Faithful adherence to legislative mandates and to the integrity of the public fisc have compelled the Commission to engage in certain supervision of the schools. The Act requires that the applicants be "eligible for admission" to public schools, that the children regularly attend school, that the school be nonsectarian, and that the institution attended qualify as a school. The Commission has interpreted this last requirement to mean that the school must be a bona fide school with qualified teachers and adequate textbooks, for example, the free textbooks distributed by the State. The Commission relies on its own agents and on "visiting teachers" employed by the State Department to administer the compulsory school attendance law and to inspect the schools to determine if they meet sufficient standards to operate as schools.

Mr. Fountain testified that the Commission relies "fairly heavily" on the visiting teachers and the educators in the State Department of Education. If they "allow the school to be open, [then] it must be a school". Also, the Commission "ascertains if the school children in that particular school are receiving * * * textbooks from the State of Louisiana". He testified that the Commission has "agents going to most schools". Two schools do not allow the agents to enter their buildings. The agents "ascertain the enrollment" in each school of applicants receiving tuition grants.

In one instance the Commission decided that grants should be discontinued to nine applicants attending "a shabby school" in a garage where there were no qualified teachers and the pupils did not receive textbooks from the State Department of Education. In another instance the Commissioner questioned whether the New Orleans Hebrew Academy, which had only seven students, could qualify as a school. In addition, since the school was administered by a rabbi, the Commission questioned whether the school was nonsectarian. After a hearing with the parents in which the Commission learned that the rabbi had withdrawn and that a qualified teacher had been employed, the Commission decided to make the grants to the children who attended New Orleans Hebrew Academy.

The Commission has met with a parent group "to ascertain just if the school

---

44. Stipulation, March 30, 1967.

was being operated properly, that is, that no hanki-panki was going on". The Commission has cooperated with the parents and others establishing private schools in Plaquemines Parish and in New Orleans, by opening temporary branch offices to expedite the handling of grants in emergency situations.

G. In effect the state has established a second system of schools, competitive with the public school system. The public schools no doubt will survive such competition, but only after sustaining severe damage detrimental to the system and to students attending public schools. For example, of the 345 teachers in private schools organized since 1962, 139 teachers or 35% came from the public schools.

There are 5,187 white children in pre-1954 private schools. 3,483 receive grants although many attend expensive, fashionable, endowed schools, such as the Louise McGehee School for Girls, Newman School, and Metairie Park Country Day School.

There are 4,029 students attending private schools formed between 1954 and enactment of Act 147; 3,336 receive grants. Attending schools formed after enactment of Act 147 are 7,376 white children, of whom 6,874 receive grants; 386 Negro children, of whom 366 receive grants. In the seven districts where private schools were formed after 1962, there are 244,158 students enrolled in the public schools; 7,762 students enrolled in the private schools, of whom 7,240 receive grants. *It is a fair inference that these substantial numbers of white students at private schools represent only a small fraction of the number that will enroll in such schools, should the courts bless the state tuition grant program.*

In brief, the evidence produced in court of the actual effect of Act 147 substantiates the view of the purpose and the natural or reasonable effect of the law to be inferred from an understanding of Act 147 in its historical context and legislative setting. The tuition grants authorized under the Act provided the funds indispensable to establishing newly organized private segregated schools for white children. The tuition grants continue to furnish almost all of the funds needed for maintaining these post-Brown schools. What Hall v. St. Helena forbade the State to do directly, it has attempted to accomplish indirectly. The tuition grants damage Negroes by draining students, teachers, and funds from the desegregated public school system into a competitive, segregated "quasi-public" school system. The stamp of State approval of "white" schools perpetuates the open humiliation of the Negro implicit in segregated education.

V.

The Defendants' Authorities;
Lee v. Macon County;
The Griffin Test

The defendants insist that Act 147 stands alone, and that it is constitutional on its face and as applied.

A. Defendants' counsel resort to history, going back to colonial times, to trace the record of public assistance to private schools. But as we noted in our discussion of the statutory purpose (Section II of this opinion), the overriding constitutional principle here is that "acts generally lawful may become unlawful when done to accomplish an unlawful end". The unlawful end and necessary effect of the Louisiana tuition grants were to establish and maintain a system of segregated schools for white children, in violation of the equal protection clause.

In support of their contention, counsel cite Meyer v. Nebraska, 1923, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042; Pierce v. Society of the Sisters, 1925, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070; Cochran v. Louisiana State Board of Education, 1930, 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913; and Everson v. Board of Education, 1947, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711. *Meyer*, a due process case, held that a state law prohibiting the teaching of "any subject to any person in any language other than the English language" is "arbitrary or without

reasonable relation to some purpose within the competency of the State". The Court observed, "Determination by the Legislature of what constitutes proper exercise of police power is not final or conclusive but is subject to supervision by the courts". In *Pierce* an Oregon statute in effect prohibited private elementary schools by requiring children between the ages of eight and sixteen to attend public schools. The Court held that the statute violated due process in unreasonably interfering with the liberty of parents by forcing their children to accept instruction from public teachers only. *Cochran* involved state-supplied schoolbooks, *Everson* state-supplied bus transportation to all pupils. In these two cases, the question was whether the expenditure of public funds for private purposes violated the due process clause. In each case the Court recognized that the taxing power of the state was exerted for a public purpose.

The shafts cut from these due process decisions miss their target. None of these cases involved the equal protection clause. The Supreme Court had very little difficulty in *Cochran* and in *Everson* in recognizing a public purpose in legislation facilitating the opportunity of children to get a secular education. But in *Cochran* the Court pointed out, "The schools, however, are not the beneficiaries of these appropriations * * *" And in *Everson* the Court pointed out, "The fact that a state law, passed to satisfy a public need, coincides with the personal desires of the individuals most directly affected is certainly an inadequate reason for us to say that a legislature has erroneously appraised a public need". On the facts before us, the private schools established in Louisiana are direct beneficiaries of the grants in aid; the children or the parents are conduits to the schools.

B. The 1958 program invalidated in Hall v. St. Helena Parish School Board, E.D.La.1961, 197 F.Supp. 649, aff'd 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521, allowed parish school boards to close public schools under desegregation orders and to lease the buildings to private persons and cooperatives. The present program funnels public funds into the hands of private persons who are thereby enabled to provide different school buildings but count on having the same students and teachers. The 1962 plan has the same purpose and many of the effects of the 1958 plan.

A parallel development took place in Alabama, which has also had three successive tuition grants programs. In 1956 Alabama authorized each local board of education to close public schools when it found that continued operation of the schools would "be accompanied by such tensions, friction, or potential disorder or ill will within the school as substantially to impair effective standards or objectives of education of its pupils".[45] This statute, like the 1958 Louisiana law, authorized tuition grants for students attending private nondenominational schools in districts where no public school was available. In 1964 a three-judge court in Lee v. Macon County Board of Education, M.D.Ala., 231 F.Supp. 743, held that the law was unconstitutional. In 1965, Alabama, like Louisiana, adopted a more refined substitute for the earlier version. This new statute was cast in terms of making eligibility turn on the parent's judgment that the child's attendance at public school would be detrimental to the child's "physical and emotional health". In 1967, in the most recent decision in Lee v. Macon County, D.C., 267 F.Supp. 458, the same three-judge court held: The tuition grant statute was "designed to aid and assist private discrimination of the kind that would be condemned if attempted by the state. As such the statute is unconstitutional." In reaching this conclusion the Court applied criteria we consider applicable to the case before this Court:

[L]ocal authorities are under an affirmative constitutional duty to provide equal educational opportunities for all children by ceasing to discriminate on the basis of race and to the ex-

45. Ala.Acts 1956, Spec.Sess.; Act 82, p. 119.

tent herein noted and ordered, eliminating the effects of past discrimination. To obviate the performance of this duty, a state may neither operate and maintain two school systems—one integrated, one segregated—giving public school students a choice between the two, nor simply go out of the business of running schools in some school districts and allow that function to be undertaken by private persons. It is also axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish.

Measured against these criteria and when viewed in the context of the facts and circumstances which gave rise to its enactment, the vice of the present tuition statute becomes clear: it is but another attempt of the State of Alabama to circumvent the principles of *Brown* by helping to promote and finance a private school system for white students not wishing to attend public schools also attended by Negroes.

Alabama's present tuition statute must be analyzed in the historical context which gave rise to its enactment. It is unmistakably clear that the concept of tuition grants to students wishing to attend private schools in Alabama was born of an effort to resist and frustrate implementation of the *Brown* decision. 267 F.Supp. at 475, 476.

C. The Virginia system of tuition grants was invalidated in Griffin v. State Board of Education, E.D.Va.1965, 239 F. Supp. 560 (unappealed). The Virginia tuition statute authorized grants of $125 a year for elementary pupils and $150 a year for high school students. This money came from the State Treasury. In addition, each local school board could pay each child an amount equal to the amount the State provided. A three-judge court stated, and we agree:

> With the plaintiffs, we think the State cannot ignore any plain misuse to which a grant has been or is intended to be put. Nor do we think weight

is to be accorded the fact that the money is paid to the pupil or parent and not to the school, for the pupil or parent is a mere channel. Cf. Almond v. Day, 197 Va. 419, 89 S.E.2d 851, 857 (1955). These premises of decision have especial significance here because the issue is the right of the State or locality to make, and not the right of the pupils, parents or schools to take, the grants. 239 F.Supp. 560, 563.

The court found, "incontestably, that the grants are the main support" of each of the segregated schools:

> This contribution is of such relative magnitude that they plainly are State supported institutions. Thus the State is nurturing segregated schools. Hence, the defendants must be enjoined from providing money to be funnelled by the parents into these schools so long as segregation is practiced in them. 239 F.Supp. 560 at 565.

We have made a similar finding and reached a similar result in this case.

In *Griffin,* however, the court held that the Virginia tuition grant statute was not unconstitutional on its face and that, as administered, the tuition grants are unconstitutional only because they "predominantly maintain" a segregated school. The court said:

> Payment of a tuition grant for use in a private school is legal if it does not tend in a determinative degree to perpetuate segregation. The test is not the policy of the school, but the measure in which the grant or grants contribute to effect the exclusion on account of race. Every exclusive school is not a forbidden school. The part played by the grant in effectuating the exclusion, to repeat, is the pivotal point. It is decisive because the extent of such participation determines whether or not the exclusion is State action—the fundamental question here. * * * Our determination is simply that the preponderant support of a segregated school may not be rooted in State action. 239 F.Supp. at 565.

Because of the "predominance" test adopted in *Griffin* and in the Civil Rights Act, the Louisiana Commission adopted its resolution limiting grants, after June 1967, to applicants attending schools not "predominantly maintained" by state tuition grants. The Commission argues strongly that, at least from now on, the resolution cures any unconstitutional effect or application of the law.

With deference, we disagree with the criterion the Court applied in *Griffin*. The payment of public funds in any amount through a state commission under authority of a state law is undeniably state action. The question is whether such action in aid of private discrimination violates the equal protection clause.

When state funds predominantly support a private segregated school and when such a school, by congressional act, may be described as a "public school" for certain purposes of the Civil Rights Act of 1964,[46] the state involvement is a double *fortiori* case of unconstitutional state action. But decisions on the constitutionality of state involvement in private discrimination do not turn on whether the state aid adds up to 51 per cent or adds up only to 49 per cent of the support of the segregated institution. The criterion is whether the state is so *significantly* involved in the private discrimination as to render the state action and the private action violative of the equal protection clause. (Here the plaintiffs ask only that the state be enjoined from paying the tuition grants; not that the schools be desegregated.)

The courts have wisely not attempted to devise a formula that would include "significant involvement" in all types of private discrimination. In the Little Rock case the Supreme Court said, "State support of segregated schools *through any arrangement,* management, funds, or property cannot be squared with the Fourteenth Amendment's command that no State shall deny to any person within its jurisdiction the equal protection of the laws". Cooper v. Aaron, 1958, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5. In Lee v. Macon County the court said that the State, through tuition grants, may not "induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish". 267 F.Supp. 458. The court in that case, properly we think, focused on the State's approval or sponsorship of private segregated schools. The constitutional odium of official approval of race discrimination has no necessary relation to the extent of the State's financial support of a discriminatory institution. Any aid to segregated schools that is the product of the State's affirmative, purposeful policy of fostering segregated schools and has the effect of encouraging discrimination is significant state involvement in private discrimination. (We distinguish, therefore, state aid from tax benefits, free schoolbooks, and other products of the State's traditional policy of benevolence toward charitable and educational institutions.)

What constitutes significant forbidden involvement may depend on the case. In the exercise of the right to vote, the prohibited involvement may be very slight. In Anderson v. Martin, 1964, 375 U.S. 399, 84 S.Ct. 454, 11 L.Ed.2d 430, a State law required that candidates for office be identified by race on the ballot. The specific act of discrimination took place in the privacy of the ballot box. The State's obvious purpose of fostering discrimination rendered the law invalid. A unanimous court identified the vice as "the placing of the power of the State behind a racial classification that induces prejudice at the polls". The same principle should apply in the field of education. In the most recent decision in the Girard College litigation, Commonwealth of Pennsylvania v. Brown, E.D.Pa.1967, 270 F.Supp. 782, the court focused on "first, the nature of the State involvement, and second, the nature of the institution concerned, be it park, school, or

46. See footnote 13.

whatever". The court concluded: "Where the conscious *purpose* of the State action is to foster discrimination, the mere fact of such action requires constitutional sanctions".

In Burton v. Wilmington Parking Authority, 1961, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45, the Supreme Court repeated the language from Aaron v. Cooper that "state participation through any arrangement, management, funds or property" is state action. In *Burton* a privately operated restaurant, located within an automobile parking building, refused to serve a Negro. The State's only involvement was that the restaurant owner leased the premises from the Wilmington Parking Authority, a state agency. The governmental agency did not operate, manage, or participate in the operation or management of the restaurant.

In Simkins v. Moses H. Cone Memorial Hospital, 4 Cir. 1963, 323 F.2d 959, cert. denied 376 U.S. 938, 84 S.Ct. 793, 11 L. Ed.2d 659, the court ordered a private hospital to desegregate. The Cone Memorial Hospital was built in 1911 with private funds. It owned and operated facilities having a depreciated cost value of many millions of dollars, and, in addition, had a substantial endowment. In 1954 and again in 1960 the hospital received a total of $1,250,000 in Hill-Burton funds in connection with additions costing $7,-350,000. The government funds amounted to about seventeen per cent of the costs of the additions, but were a very much smaller proportion of the total cost of all its facilities. Where there is no evidence of purposeful participation in private discrimination, the percentage of state aid is relevant. But the court emphasized, as we emphasize here, "this is not merely a controversy over a sum of money".

In Mulkey v. Reitman, 1966, 64 Cal. 2d 529, 50 Cal.Rptr. 881, 413 P.2d 825 (1966) the California Supreme Court impliedly held that § 26 of the California constitution was discriminatory because, by repealing prior legislation forbidding discrimination in housing, the section established an atmosphere conducive to discrimination. The court found that there could be a prohibited state involvement "even where the State can be charged only with encouraging, rather than commanding discrimination". In reaching this result, the court examined § 26 in terms of its "immediate objective", its "ultimate impact", and its "historical context and conditions existing prior to its enactment". The Supreme Court affirmed. Reitman v. Mulkey, 1967, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed. 2d 830. Justice White, for the Court, pointed out: The California Court, "armed * * * with the knowledge of the facts and circumstances concerning the passage and the potential impact of § 26, and familiar with the milieu in which that provision would operate", held that the "purpose and intent of § 26 was to authorize private racial discriminations in the housing market * * * [T]he section would encourage and significantly involve the State in private racial discrimination". Justice Douglas, concurring, put his finger on the crux of the case: "Proposition 14 is a form of sophisticated discrimination whereby the people of California harness the energies of private groups to do indirectly what they cannot under our decisions allow their government to do." Justice Harlan, dissenting, said: "The core of the Court's opinion is that § 26 is offensive to the Fourteenth Amendment because it effectively *encourages* private discrimination". He would approach the "inducement" or "authorization" cases "in terms of the impact and extent of affirmative state governmental activities". Justice Harlan, speaking also for Justices Black, Clark, and Stewart, said: "the state action required to bring the Fourteenth Amendment into operation must be affirmative and purposeful, actively fostering discrimination. Only in such a case is ostensibly 'private' action more properly labelled 'official' ".

Louisiana's tuition grants "encourage and significantly involve [Louisiana] in private racial discrimination" more ob-

viously than California was involved through Proposition 14 and § 26. And Justice Douglas's comment applies as aptly to Act 147 of 1962 as it does to Proposition 14. Moreover, the grants meet Justice Harlan's criteria: they are an "affirmative and purposeful" means of "actively fostering discrimination". The purpose of Louisiana's tuition grant program, however, was not just to encourage and not just to authorize private racial discrimination in the field of education. The purpose was to establish and maintain "private" segregated schools.

■ As the Supreme Court noted in Reitman v. Mulkey, the "Court has never attempted the 'impossible task' of formulating an infallible test for determining whether the State 'in any of its manifestations' has become significantly involved in private discriminations". The facts must be sifted and weighed on a case-to-case basis. The cases in this area of the law teach, however, that there is no constitutional basis for courts to adopt as a test the predominance of state financial support. The State's only involvement in *Burton* was as lessor. It was very slight in *Simkins*. In Anderson v. Martin and Reitman v. Mulkey, there was no state financial involvement.

In *Griffin* the Court warned that private schools receiving tuition grants might be ordered to desegregate. "[C]ontinued predominantly State or local government support of the private schools herein mentioned might expose some of the defendants to subsequent suit under the [Civil Rights] Act". 239 F. Supp. at 566. In Lee v. Macon County, the Court issued a similar warning based on the State's "significant involvement." The court did not refer to the Civil Rights Act definition or to the Griffin test. The Court found that Alabama was attempting to "support a separate and private school system for white students". "Moreover, the Governor has officially encouraged private contributions to support the many private schools throughout the state *as alternatives to the public desegregated*

*school system*". The Court warned, "if the state persisted, and if its involvement with the private school system continues to be 'significant', then this 'private' system will have become a state factor within the meaning of the Fourteenth Amendment and will need to be brought under this Court's state-wide desegregation order". 267 F.Supp. at 478. Underscoring the meaning of "significant involvement", the Court cited Anderson v. Martin, *Burton*, and *Simkins*.

*Griffin*, one of the cases handed down with *Brown* in 1954, concerned the public schools in Prince Edward County, Virginia. In 1964 the Supreme Court held that the Virginia statute providing tuition grants, when coupled with closing of the public schools, denied Negroes an integrated education. 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256. "The same reasoning applies when the grants alone deny Negroes an integrated public education by assisting whites to flee to private schools. It is impossible to set a standard as to the number of whites who may leave before the schools become segregated, but state-encouraged departure of any whites tends to create segregation, and it would seem that any state support of segregation violates the equal protection clause." Note, 79 Harv.L.Rev. 841, 843 (1966), discussing *Griffin*. This conclusion is consistent with the principle expressed in Cooper v. Aaron that State support of segregated schools "through any arrangement, management, funds, or property cannot be squared with the [Fourteenth] Amendment." 358 U.S. at 4, 78 S.Ct. at 1403, 3 L.Ed.2d 5. And it is consistent with the principle expressed in Lee v. Macon County that the State may not "induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish". 267 F.Supp. at 476.

\* \* \*

We summarize.

■ The system of private segregated schools the State created and nourishes through Act 147 is in a nascent stage.

Its tangible and intangible costs to the State *thus far* are but a drop in the bucket compared with its future costs—should the courts bless the nourishment the private schools receive from the State. The facts this case presents point in only one direction: Unless this system is destroyed, it will shatter to bits the public school system of Louisiana and kill the hope that now exists for equal educational opportunities for all our citizens, white and black.

We hold that the purpose and natural or reasonable effect of Act 147 of 1962 render it unconstitutional on its face. The law was designed to establish and maintain a system of segregated schools. We hold also that Act 147 of 1962 is unconstitutional in its actual effect. The State has predominantly supplied the financial means necessary to establish and maintain the post-1962 private schools and most of the post-1954 private schools in Louisiana. The State is so significantly involved in the discrimination practiced by the private schools in Louisiana that any financial aid from the State to these schools or newly organized schools in the form of tuition grants or similar benefits violates the equal protection clause of the Fourteenth Amendment.

The tuition grants have benefitted certain special schools for handicapped, retarded, and exceptional children. Some of these schools are barely able to exist with the help of tuition grants. But the court cannot rewrite Act 147 so as to provide funds for these schools. That responsibility is the Louisiana Legislature's.

### ORDER

In accordance with the findings of fact and conclusions of law in the foregoing opinion,

It is hereby ordered that the defendant Louisiana Financial Assistance Commission, its members, officers, agents, servants, employees and successors in office, and all those who are acting or may act in concert or participation with them are hereby restrained, enjoined and prohibited from enforcing or seeking to enforce by any means the provisions of Act 147 of the 1962 Session of the Louisiana Legislature.

This Court retains jurisdiction of this cause to amend or modify this decree or to issue such further orders as may be necessary and appropriate.

The costs incurred in this proceeding to date are hereby taxed against the defendants.

858

TOTAL AMOUNT OF GRANTS-IN-AID TO STUDENTS ATTENDING PRIVATE SCHOOLS FOR NEGRO CHILDREN IN LOUISIANA

$338,760.00
(Projected through school year)

$54,832.90    $222,898.00    $289,854.00.

$141,666.00
(Dec. 31, 1966)

TOTAL AMOUNT OF GRANTS-IN-AID TO STUDENTS ATTENDING PRIVATE SCHOOLS FOR WHITE CHILDREN IN LOUISIANA

$4,920,120.00
(Projected through school year)

$3,403,756.04    $3,478,741.96

$2,023,146.82

$1,942,240.29
(Dec. 31, 1966)

1962-63    1963-64    1964-65    1965-66    1966-67

SCHOOL YEAR

TOTAL AMOUNT OF GRANTS FROM LOUISIANA FINANCIAL ASSISTANCE COMMISSION

### 1962–1963

| School Category | Total Recipients | Total Grant |
|---|---|---|
| White – normal | 6,711 | $1,992,890.82 |
| White – special | 101 | 30,256.00 |
| Negro – normal | 156 | 32,334.90 |
| Negro – special | 125 | 22,498.00 |
| Total | 7,093 | $2,077,979.72 |

### 1963–1964*

| | Total Recipients | Total Grant |
|---|---|---|
| Total | 12,167 | $3,594,023.07 |

### 1964–1965

| School Category | Total Recipients | Total Grant |
|---|---|---|
| White – normal | 10,130 | $3,349,418.82 |
| White – special | 215 | 54,337.22 |
| Negro – normal | 295 | 91,870.00 |
| Negro – special | 487 | 131,028.00 |
| Caddo–Bossier** | 174 | 33,789.50 |
| Total | 11,301 | $3,660,443.54 |

### 1965–1966

| School Category | Total Recipients | Total Grant |
|---|---|---|
| White – normal | 10,245 | $3,390,330.19 |
| White – special | 312 | 88,411.77 |
| Negro – normal | 352 | 124,624.00 |
| Negro – special | 594 | 165,230.00 |
| Caddo–Bossier | 187 | 3,827,241.96 |
| Total | 11,690 | $3,827,241.96 |

### 1966–1967
#### (through December 31, 1966)

| School Category | Total Recipients | Total Grant |
|---|---|---|
| White – normal | 13,845 | $1,902,724.83 |
| White – special | 286 | 39,515.46 |
| Negro – normal | 391 | 61,516.00 |
| Negro – special | 568 | 80,150.00 |
| Caddo–Bossier | 87 | 11,122.00 |
| Total | 15,177 | $2,095,028.29 |

\* A breakdown of these figures for the 1963–1964 school year is not available.
\*\* Caddo-Bossier Association for Retarded Children is treated separately because it is comprised of two units, one for whites and one for Negroes.